HART-BARTLETT-STURTEVANT GRAIN COMPANY, a Corporation, Plaintiff-Appellant, v. AETNA INSURANCE COMPANY et al., Defendants-Respondents, No. 44944—293 S. W. (2d) 913.

Division One, September 10, 1956.

Motion for Rehearing or to Transfer to Banc Overruled, October 8, 1956.

*Ralph M. Jones, Charles B. Blackmar* and *Blackmar, Swanson, Midgley, Jones & Eager* for appellant.

*Donald N. Clausen, Henry Depping* and *Joseph R. Hogsett* for respondents; *Clausen, Hirsh & Miller* and *Hogsett, Houts, James, Randall & Hogsett* of counsel.

[915] VAN OSDOL, C.—This is an action on three certificates of insurance issued to plaintiff, the lessee-operator of the River-Rail Elevator located in Kansas City, Kansas. The certificates were issued by Underwriters Grain Association for and on behalf of the forty-eight defendant-respondent insurance companies which participated in the coverage for loss of grains and loss due to interruption of business, the measure of recovery for loss due to interruption of business being the directly resulting reduction of gross earnings. The certificate insuring the grain, contents of the elevator, was in the provisional amount of $5,000,000. Plaintiff sought recovery on this certificate in Count I of its petition. The coverage for loss of earnings was in two certificates, each in the amount of $342,000—(1) covering reduction in gross earnings for such length of time as would be required to rebuild, repair or replace such part of the elevator facilities as might become damaged or destroyed commencing with the date of damage or destruction, and (2) covering reduction of gross earnings for such length of time as would be required to resume normal operations commencing with the date of restoration. Plaintiff declared on these certificates in Count II of its petition. The three certificates contained identical extended coverage endorsements by which, for an additional premium, coverage was extended to include direct loss by "*explosion.*"

The trial court submitted the issues of plaintiff's case to the jury. One decisive supporting issue was whether plaintiff's losses were due to explosion, or explosions. The jury found for the plaintiff, assessing its whole loss, with interest, in the total amount of $769,522.74; however, the trial court sustained defendants' motion for judgment in accordance with their motion for a directed verdict, set aside the verdict and judgment for plaintiff, and entered judgment for defendants, but overruled defendants' motion for a new trial. The trial court in sustaining defendants' motion for judgment specified the grounds: (1) the evidence conclusively shows that all of plaintiff's loss was

caused by flood (a hazard not insured against), not by any explosion; (2) there is no evidence on which a jury could base a verdict for plaintiff on the explosion issue without resorting to guesswork, speculation, conjecture and surmise; and (3) it has previously been judicially determined that the very occurrences in the case at bar were not explosions, and therefore plaintiff is estopped from relitigating that question. Plaintiff has appealed.

The River-Rail Elevator is owned by the City of Kansas City, Kansas. It is located [916] about a thousand feet from the Missouri River bank in the public levee area known as the Fairfax District, and is connected to a public wharf by a gallery with grain conveyor so that grain may be received and delivered from and to barges. It it also served by railroads and trucks.

The structure of the elevator consists of a headhouse (containing much of the elevator-operating machinery and bins, including at least one "dryer bin" at the basement level), and of two batteries of round and interstice or "star" bins, one battery consisting of ninety-five bins and the other of eighty-eight. The round bins each have an inside diameter of nineteen feet and a capacity of 24,400 bushels of grain. The interstice bins (comprising the spaces between the exterior walls of round bins) each has a capacity of 5,500 bushels. The bins are approximately one hundred five feet in height with walls of concrete six inches thick. The whole of the two batteries of bins is surmounted by a one-story structure called the "Texas floor." A relatively small, square aperture in the top of each and all of the bins of both batteries opens through the floor of the Texas floor. The bottoms of the bins are at the approximate ground level and constitute the ceiling of the basement of the elevator structure. July 13, 1951, all of the round and interstice bins, except nine, contained grain in some quantity. The grains were wheat, corn, and grain sorghums.

A "draw-off" hole five feet in diameter is located in the center of the base or bottom (concrete "slab" one foot thick) of each bin. The slab is "hoppered" in a thirty-six degree slope down to the "draw-off" hole. This conical upper side of each slab bin-base is called the "concrete hopper." Octagonal "metal hopper bottoms" are fixed below to receive grain passing through the holes in the concrete hoppers. The hopper bottoms are attached to the concrete on the under side of the base of each bin. The hopper bottoms are "funneled" down at various angles and are connected with elongated rectangular metal "draw-off" spouts angling off at various degrees, through which, by opening slides or gates controlled by ratchets, grain may be permitted to flow from the bins through the holes in the concrete hoppers and on down through the hopper bottoms and connected spouts onto belt conveyors. The hopper bottoms of all of the forty-three bins with which we are directly concerned are alike in shape and size, except one—the rectangular metal hopper bottom of a dryer

bin—this metal bottom is bolted directly to the under side of the concrete base of the bin.

Friday, July 13, 1951, the flooding waters of the Kaw River inundated areas of the industrial districts of Kansas City, Kansas, and in the late afternoon of July 14th, the waters broke through the river levee and inundated the area wherein the elevator is located. During the night of July 14th, waters came into the basement of the elevator, flooding everything therein, including the spouts and hopper bottoms, and rose until the waters had reached a level of "slightly more than two feet" within the concrete hoppers of all of the bins. On the following day, July 15th, the waters began receding from the pavement and ground in the elevator area, but the basement of the elevator remained filled with water. Limited pumping-out operations were commenced on Monday, July 16th. The grains in the concrete hoppers had been wetted by the floods, however, and in the morning of July 17th grain was noticed on top of the water in the basement—it was ascertained that the hopper bottoms ("tanks") of some of the round and interstice bins were "down," permitting quantities of grain to come down through the five-foot draw-off holes into the water.

Each of the octagonally-shaped metal hopper bottoms had been held in place against the under side of the "slab" bottom of a bin by sixteen "clips,"—strips of low-carbon hot-rolled ductile steel, one-fourth inch thick, two inches wide, and six inches long; however, the contact between the [917] metallic hopper bottoms and the slab was not airtight, watertight, or gastight. The sixteen clips had been fixed at only approximately equal intervals around the periphery of the draw-off hole in the base of a bin. Each of the clips had been fixed by a nut with washer to a five-eighths-inch bolt embedded in the concrete of the bin-base, the bolt passing through the clip two inches from one end, and the other end ("moment arm") of each and all of the sixteen clips of each bin lay under and supported the $2''$x$1$-$\frac{1}{2}''$ angle-iron flange ($\frac{3}{16}''$ thick) riveted to the top of the sheet metal of each hopper bottom.

There was evidence that forty-two of the hopper bottoms of the round and interstice bins which had contained grain had been completely detached or expelled by some force or forces occurring after the inundation and partial recession of the flood waters; the draw-off spouts were bent or crushed and bracing hangers pulled or jerked and detached. And a corner of the rectangular hopper bottom of the dryer bin had become fissured or ruptured—the hopper bottom of the dryer bin had a "split" down one corner, "I would say approximately 18 inches. - - - I would say it was between 2-$\frac{1}{2}$ and 3 inches wide at the widest point. Of course, it was narrowed down at each end." These occurrences had permitted large quantities of grain to pass down into the water in the basement.

It was and is plaintiff's theory that the wet grain within the hopper bottoms and bases of the bins expanded, and the expansion of the grain with its ensuing pressure was augmented by the generation of gases with increasing pressure resulting in the sudden and violent expulsion of the hopper bottoms; but, that, whatever occasioned the pressure in the bases of the bins, the hopper bottoms of the forty-two bins were displaced as a result of high-pressure force or forces, and that such expulsion of these hopper bottoms (and the splitting or rupture of the metal bottom of the dryer bin) and resulting loss of grain and of gross earnings were due to explosion within the meaning of the word "explosion," as used in the extended-explosion-coverage endorsements.

On the other hand, it was the theory of defendants (respondents-insurers) that none of plaintiff's damage or loss was caused by explosion. Defendants contended, and now contend, that the only reasonable conclusion which may be arrived at from the evidence is that the disengagements of the hopper bottoms were due to the slow and gradual swelling of the grain; that the grain, having absorbed the floodwaters, had taken on a slowly-increasing swelling and pressure, which pressure, together with the weight of the grain, caused the metal clips supporting the hopper bottoms to bend slowly, gradually disengaging the hopper bottoms and allowing them and the grain to fall by the force of gravity; and that the same slow and gradual swelling and pressure similarly caused the split in the hopper bottom of the dryer bin. Defendants assert that no substantial evidence tended to support a conclusion that plaintiff's losses were due to explosion; indeed, defendants say that "uncontradicted and undisputed evidence" is conclusive in demonstrating that the occurrences were not explosions.

An explosion has been defined as "a violent bursting or expansion, with noise, following the sudden production of great pressure, as in the case of explosives, *or a sudden release of pressure, as in the* disruption of a steam boiler; - - -." (Our italics.) Webster's New International Dictionary, 2d Ed., p. 898. American Paper Products Co. v. Continental Ins. Co., 208 Mo. App. 87, 225 S.W. 1029 (writ of certiorari quashed in Continental Ins. Co. v. Reynolds, 290 Mo. 362, 235 S.W. 88), dealt with a clause excluding coverage of the hazard of "explosion." A waterhammer had blown off the cap of a "hot-well." Plaintiff in that case would have had the meaning of the term "explosion" limited to those occurrences caused by combustion or fire. Of [918] course, an explosion is frequently caused by combustion, but not necessarily so. The term is to be given its ordinary and accepted meaning. In St. Louis Gaslight Co. v. American Fire Ins. Co. of Philadelphia, 33 Mo. App. 348, the reviewing court, quoting Webster, spoke of an explosion as a *"sudden bursting with noise."* The witnesses had assumed the term "explosion" meant

a rending force caused by the instantaneous and violent expansion of the mixture of gas and air, distinguishable from a mere deflagration of the gas. In Commercial Union Fire Ins. Co. of New York v. Bank of Georgia, 5 Cir., 197 F.2d 455, a waterhammer ruptured a fire hydrant. The occurrence was held an explosion within the purview of a policy insuring against damage by explosion. It was said that an explosion is a rapid, sudden, and violent expansion of air or relinquishment of energy, causing a rupture and accompanied by a loud noise, not necessarily extremely loud. Perhaps the principal cause of explosions is fire, but they may be produced without the aid of fire. A flywheel may explode from excessive speed. A severe frost may cause trees to explode. The occurrence constituting an explosion within the meaning of the extended-coverage provision of an insurance policy must be determined from the language of a policy, the ordinary uses of the word, the common experience of men, and their general notions in matters of this sort. And see L. L. Olds Seed Co. v. Commercial Union Assurance Co., 7 Cir., 179 F.2d 472, wherein water from a break 2-½'' in length and ½'' wide along a 2'' water pipe due to waterhammer damaged merchandise in insured's basement. It was said the word ''explosion'' is not one that lends itself to a precise definition. *General characteristics may be described, but the exact facts which constitute what we call an explosion are not susceptible of such statement as would always distinguish such an occurrence* (Hartford Fire Ins. Co. v. Empire Coal Min. Co., 8 Cir., 30 F.2d 794). See also Lever Bros. v. Atlas Assur. Co., Ltd., 7 Cir., 131 F.2d 770 (the theory of insured was that water at the bottom of a cottonseed-oil tank had become superheated and converted into steam, resulting in an explosion); Bower v. Aetna Ins. Co., D.C.N.D. Tex., 54 F. Supp. 897 (in the absence of insured, water in the hot-water-heating system of insured's house froze, and in the process of freezing expanded so as to explode, or burst the pipes, with resultant water damage); Crombie & Co., Inc. v. Employers' Fire Ins. Co. of Boston, Tex. Civ. App., 250 S.W.2d 472 (the sudden emission of refrigerating ammonia through a valve packing; it was thought the evidence supported the finding of explosion, ''though the intensity or degree was much less than in great eruptions we often think about, but nevertheless an explosion''); 35 C.J.S., Explosion, pp. 215-216; and Vol. 15A, Words and Phrases, Perm. Ed., Explosion, pp. 478, et seq.

■ We shall consider the evidence pertinent to the issue of explosion from a standpoint most favorable to plaintiff.

There was evidence that in the morning of Tuesday, July 17th, grain was noticed on top of the water in the elevator basement. Plaintiff's grain mixer, Byrd, and weighmaster, Shafer, went to the Texas floor to make soundings. A sounding is accomplished by lowering a measuring tape with weighted end down into a bin. The soundings

showed there was definitely grain in the basement. While Byrd and Shafer were making soundings they heard noises. They were not sure where the noises came from. Byrd testified the noises were "all similar," except the last one, which was much louder. The sounds heard came from different parts of the elevator. When Byrd and Shafer came directly above Bin 101, which contained 24,006 bushels of corn, they heard a noise. It sounded more like "you'd hit something real hard, like a drum. But there was a vibration of the floor that we were standing on - - -." The last noise—the one from Bin 101—was a "sudden noise." Shafer described the noise as being "like a metal barrel that had been in the sun, that [919] had a sudden expansion of the barrel, with a sharp click to it." It was a sharp noise, "very sharp." "There was vibration there." The noise was like pushing the bottom of a dishpan in and out. The witnesses immediately went down to the ground level, moved their automobiles from the vicinity of the elevator, and thrust a pole through the basement window beneath Bin 101. There was dust floating on the water, and "I touched grain. The grain was right up against the ceiling." There was also some testimony that when those "tanks went out, why that broke some of the (basement) windows and closed some of the (basement) windows (which were open)."

A consulting mechanical engineer, witness for plaintiff, testified that photographs of the bottoms of bins from which the metal hopper bottoms had been detached or expelled disclosed that the metal clips, although they had not been uniformly set around the peripheries of the five-foot holes, seemed nevertheless to have been quite uniformly bent down. (See Plaintiff's Exhibit 65, reproduced herewith.) "- - - it appeared [920] that the hoppers had been expelled directly down without shifting to one side or the other, as they left the slab, and from that it was one of the things that influenced me to believe that the hoppers must have been forced off quite rapidly or explosively, because that is characteristic of the forces that remove it. In other words, there are two forces that set that hopper in motion, or rather that have to be overcome before the hopper will leave that. One is the restraint on the clips themselves. In other words, the things that hold it, and the other thing is the force that has to give it the energy to move." The witness also spoke of the way several of the "draw-off" spouts were crumpled or buckled. (See Plaintiff's Exhibit 61, reproduced herewith.) He said "the angles appear to substantiate the fact that they went directly down - - -."

Experiments tended to demonstrate, and a witness for defendants testified, the clips of "bendable," ductile steel would bend back and forth several times before they would break. One shock or one steady push would not break them. They would bend "no matter how fast

Plaintiff's Exhibit 65

Plaintiff's Exhibit 61

that one shock was." A witness for plaintiff testified that tests (subjecting steel of like ductile quality as the metal of the clips to increasing pressure) showed that, after the maximum strength of the metal was reached, it "bent with a jerk. - - - a sharp, snapping sound."

All expert witnesses testified that grain expands when wet. Expanding grain when contained exerts great pressure. If the pressure is

partially eased, the mass of wet grain increases and the pressure builds up again. One of plaintiff's experts testified that the swelling is rapid for the first twenty hours, then the expansion slows up, and at the end of fifty hours there is no further swelling.

[921] An expert testified an experiment demonstrated a clip of mild, low-carbon steel would begin to bend when subjected to pressure of 1000-1100 pounds, and upon continued and increased pressure "somewhat greater" than 2000 pounds the clip would bend to the point of maximum strength, at which time the clip would completely yield. The witness was of the opinion that the expansion of the wet grain with its pent-up pressure "deformed these clips to a certain point," after which the continued expansion forced the clips through their maximum strength—"that state of metastable equilibrium"; they then suddenly failed; and the "hopper bottoms must have expelled rapidly." It was not just a question of merely dropping off, but of being expelled by these tremendous pressures within. (It was said it is not to be assumed that the weight of grain in a bin bore down entirely on the hopper bottom or on the bin-base. The grains in contact or friction between grains and with sidewalls have a tendency to "arch or bridge" in accordance with the generally accepted Janssen's Formula.) A witness for defendants testified that one clip would support approximately 540 pounds before it surpassed the yield point, and the maximum strength would be 950-970 pounds for one clip.

Expert witnesses also explained the anaerobic process of fermentation which starts when grain is under water. In this process, when the grain begins to ferment, gases are generated—carbon dioxide and hydrogen. One hundred pounds of wheat could liberate 16.8 gallons of gas in three days, when submerged in distilled water at a temperature of 86 degrees. These gases are capable of exerting great pressure. The hydrogen element makes the mixture inflammable when mixed with oxygen, although it is purely conjectural that such a gas mixture could have been ignited under the conditions obtaining at the time of the instant questioned occurrences.

A witness for defendants testified experiments had shown that wheat soaked in water for seven days imbibed water to the extent of 44.4 percent, corn 41.0 percent, and sorghum 35.4 percent. With respect to the generation of gases, an experiment conducted by the witness showed the appearance of gas eighteen hours after the grain was soaked in water—the production of gas was rather low until thirty hours had elapsed, after which gas was evolved at an ever-increasing rate. The experiment was conducted up to "72 hours, three days." This witness, however, was of the opinion that the gases produced in the bin bottoms of the River-Rail elevator had no effect "on the

forcing-off of the hopper bottoms," for the reason, he said, wet grain is quite permeable to gases, and the gas production during the time of the immersion, as well as for sometime afterward, was at a considerably lower rate than the amount of gas which could permeate or move and become diffused through the wet columns of grain in the bins. Yet there was evidence that soaked grain "mushes down," and thus the interseed spaces that ordinarily would permit gas to escape would be greatly reduced. And the witness had reported an experiment indicating that the initial wetting of wheat when trapped air was removed over a period of forty-five minutes caused an increase of volume from 40 to 48 cubic centimeters; after soaking for thirty hours the volume rose to 59 cubic centimeters; and after seventy-two hours a volume limit of 69 cubic centimeters appeared to have been reached. An experiment treated with wet grains contained in three glass test tubes. Thirty-six hours after the wetting the kernels were flattened and distorted. The grain in a tube containing corn expanded to the extext of pressure that it broke the glass. The rubber stoppers of the other two tubes were forced off by the expansion.

Except in respects immaterial here, insurers' policies did not limit the coverage [922] for "explosion" to explosions by ignition or combustion or expansion of gas, or to any explosion due to any particular cause. We therefore consider the coverage contemplated any explosion within the meaning of the term as commonly accepted. See the authorities cited supra treating with the meaning of the term "explosion."

In view of the evidence in this case that when confined pressure due to imbibition is partially eased, the mass of wet grain will expand and build up pressure again, we do not wish to say as a matter of law that a slight initial easing or pressing, if so, of the hopper bottoms away from the slab means that any or all of the forty-three occurrences could not culminate in sudden releases of pressure which could be said to be explosions as the term "explosion" is ordinarily understood.

There was evidence of conditions potential to the evolving of gas by an anaerobic fermentation. But, whether or not there was substantial evidence that high-pressure gas evolved and whether or not such gas, by ignition or expansion, caused or helped to cause the detachment of the hopper bottoms, there is no dispute between the parties or disagreement between their repective witnesses that grain when wetted expands and that expanding grain when confined has great pressure force. Defendants have said in their brief, "Both the Grain Company and the insurers are in agreement that swelling grain exerts tremendous pressure on any container in which it is held." Plaintiff had only the burden of proving there was an explosion. Plaintiff did not have any burden of proving in what particular way

the explosion was caused. Hartford Fire Ins. Co. v. Empire Coal Min. Co., supra.

The reviewing court in Crombie & Co. v. Employers' Fire Ins. Co. of Boston, supra, remarked, "A soda pop bottle blows the cap, or breaks the glass in a weak spot, so may the medicine bottle in the cabinet and the vinegar bottle in the pantry and it is said they explode." An expert witness in the instant case said a hopper-bottom-capped bin could be compared to an inverted corked bottle. The cork "would blow before you break the bottle." Of the force within, another (lay) witness said, "- - - just like canned things. Many a time, say, well, a jar has blown up in the basement, I didn't get it right see, air and fermentation take place and blew the thing up." This reminds us of the testimony of an expert, defendants' witness, whose experiment with wetted grains in three test tubes indicated the pressure due to imbibition forced out the stoppers of two of the tubes and broke the glass of the third. Should some high-pressure phenomenon in whatever contents of a stoppered bottle slowly start the stopper from its seat and then suddenly and violently force the stopper completely out with a pop, we think one ordinarily would say there was an explosion.

Although in large measure plaintiff was necessarily relying upon circumstantial evidence to show the alleged explosions, there were facts and circumstances shown in evidence which were premises for reasonable inferences and an ultimate conclusion that the hopper bottoms were suddenly and violently expelled.

(The cases of Allen v. Insurance Co. of North America, 175 Pa. Super. 281, 104 A.2d 191; Hicks v. New York Fire Ins. Co., 266 Wis. 186, 63 N.W.2d 59; and Bauman v. Midland Union Ins. Co., 261 Wis. 449, 53 N.W.2d 529, cited and greatly relied on by defendants, have been of little value to us here. In the Allen case, the appellate court reviewed the trial court's finding for defendant, which finding in that case had the force and effect of a jury verdict. In affirming the judgment, the appellate court did not examine the case from the standpoint of determining if the evidence supported a verdict for plaintiff. In the Hicks case, the expert witness testified three factors must exist simultaneously in order to produce excessive pressure, but there [923] was no substantial evidence that, at the time plaintiff's radiator broke, any of the factors existed; therefore, the expert's opinion that the break in the radiator was due to the buildup of pressure was based on his own unwarranted assumptions. In the Bauman case, the question on the issue of explosion was solely whether there was any credible evidence sustaining a jury's finding that an explosion of carbon dioxide gas occurred within plaintiffs' silo causing it to burst. Plaintiffs' expert witnesses admitted that carbon dioxide will permeate loose vegetable matter and rise and escape through any opening. They would not venture an opinion as to whether such gas

would, or would not, permeate through silage and escape through cracks between wooden doors of the chute, or out the open window at the top of plaintiffs' silo. Neither would they venture any opinion that the accident was caused by the pressure of the gas. The testimony of defendant's experts did not aid plaintiffs' case.)

The clips of the "tanks" including those that were "in the basement" would give way suddenly, when forced to their maximum strength. The clips of those tanks that were in the basement were forced down equally, indicating, according to plaintiff's consulting mechanical engineer, that the tanks had been forced off rapidly or explosively. In this connection we note the evidence tending to show that the spouts of hopper bottoms which had been expelled were buckled in such fashion as to indicate that the hopper bottoms had gone "directly down." There was evidence of conditions potential in the creation of high-pressure gas within the bin-bases and hopper bottoms, and of occurrences and an occurrence manifested by sounds and a vibration timed to the approximate hours when the pressure of such gas, if present or evolving, would have been of increasing or of climactic pressure-force, according to the expert witnesses. The presence of tremendously high-pressure force due to imbibition is conceded. The sounds were not especially loud, and a vibration was not felt elsewhere than when witnesses were directly over a bin (101), the hopper of which it may be reasonably inferred was at that time expelled. Forty-three noises or reports were not heard, but a jury could reasonably resort to the other shown circumstances of the large concrete elevator structure consisting of walled-in bins and the sound-muffling waters remaining in the basement as plausible reasons why possible sounds or reports of the other events were not heard by persons not on the Texas floor when the events occurred. The absence of evidence tending to show forty-three distinct reports having been thus rationalized, the jury could then fall back upon and give decisive probative effect to the conceded circumstance of the presence of tremendous high-pressure force or forces, the shown uniformly bent clips, the peculiarly crumpled spouts, the ruptured fissure, and the experts' opinions indicating the hopper bottoms were explosively expelled or ruptured. Of course, it is not the province of the appellate court to weigh the evidence or to determine what inferences and what conclusion should have been drawn; but these observations we believe are pertinent here as illustrating legitimate mental processes jurors may use in reasoning and reaching a reasonable conclusion from facts or circumstances which the evidence was substantial in tending to show.

We believe we could not write a better summary statement of law applicable in treating with the sufficiency of the evidence in this case than the statement made by this court in Hardwick v. Kansas City Gas Co., 355 Mo. 100, at page 107, 195 S.W.2d 504, at page 508,

wherein, as herein, it was urged that a jury's verdict was based on speculation and conjecture, and that no evidence supported the verdict. It was said, "It is true that much of the evidence is circumstantial and that some of the inferences must be drawn by choosing between the conflicting opinions of experts. But this is not to deprive the jury of its right and function to find [924] some of the facts, even some facts essential to the plaintiff's case, by reasoning upon the evidence, even circumstantial evidence, and inferring from such evidence that a certain required thing or fact existed or was true. Thayer, Preliminary Treatise On Evidence, pp. 193, 194; Van Brock v. First Nat. Bank, 349 Mo. 425, 431-434, 161 S.W.2d 258, 260-261." See also Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601; Brawley v. Esterly, Mo. Sup., 267 S.W.2d 655; Helton v. Huckeba, 365 Mo. 93, 276 S.W.2d 78; Lever Bros. v. Atlas Assur. Co., Ltd., supra.

 Generally, the assertedly "uncontradicted and undisputed" evidence, which defendants say is conclusive in demonstrating that the questioned occurrences were not explosions, was the testimony of millwrights, defendants' witnesses, employees of a company plaintiff had engaged to clean up the elevator and to restore it to operating condition. One witness came to the elevator location on July 21st, the other on July 28th. They stated that for several days after their arrival many of the hopper bottoms of such of the bins that contained grain and the bottoms of which had not become disengaged or expelled were slowly "creeping" down. "You would go in there one day and go back the next day and they would be a quarter of an inch where they were creeping, - - -."

Actually, the jury was not obliged to believe the testimony of defendants' witnesses. In examining the question whether there was substantial evidence to justify a submission, or the question whether the evidence was sufficient to support a verdict, the appellate court considers only the evidence most favorable to plaintiff, and the inferences to be drawn therefrom, and disregards the evidence of defendant unless it aids plaintiff's case. Stephens v. Kansas City Gas Co., supra. But if the jury believed the testimony of these witnesses, the jury was not obliged to draw the inference that the source of the pressure which caused the hopper bottoms to slowly creep down was the same or of the same force that some days before caused the hopper bottoms in issue to become detached or expelled and ruptured. But for the moment assuming the verity of the testimony of these witnesses for defendants that the hopper bottoms were slowly creeping down several days after July 17th, we have noted that these witnesses also said that, when the hopper bottoms were "creeping" down, "they would creep from the back first, - - - I mean you would get an opening in the back of the bin ('where this big part of the hopper is') before you would from the front." This testimony that hoppers several days

after July 17th were creeping down unevenly tends to support plaintiff's factual theory that, because the hopper bottoms herein involved left their settings *evenly,* they were expelled explosively.

It is further urged that "undisputed documentary evidence" also sustained defendants' theory of no explosion. One of these "documents," introduced by plaintiff, was a letter dated August 24, 1951, from a testing laboratory. The letter contained the laboratory's classification of explosions and the laboratory's view of the process and effect of explosions brought about by various causes. The letter also contained the statement, inter alia, that "it cannot be stated that any explosion took place within the hoppers or bin bottoms," and the letter continued by giving the laboratory's theory of the way the hopper bottoms were detached. Another letter from an architect-engineer dated August 24, 1951, was introduced by plaintiff. The writer expressed the view there was no evidence whatsoever "that these spouts had been forced loose by an explosion." The writer also advised that workmen "were also taking down the spouts that had not *blown down.*" (Our italics.) The other document, introduced by defendants, was an undated "Computation of Loss Due to Flood of July 14, 1951," compiled under the supervision of plaintiff's secretary-treasurer. The computation included grain lost, **[925]** the loss of much of which plaintiff seeks to attribute to explosion. These letters and the computation, of course, were not, as a matter of law, conclusive in demonstrating that no part of the loss sustained was due to explosion. The "documents," and their weight and probative effect, were matters for the consideration of the jury on the issues of the case. Likewise, the circumstance that one or more electric lights in the basement remained burning three days after the basement was flooded; and the circumstance that the glass-encased 100-watt light bulb of a lamp, with an enameled metal shade, attached to the ceiling of the basement by a ball-and-socket swivel fixture within a foot or so of an expelled hopper bottom, had not been shattered, were inconclusive on the question of the sufficiency of the evidence in tending to support the issue of explosion. These circumstances and the opinions and explanations of and concerning them by the parties' witnesses were for the jury's consideration.

Defendants further contend that plaintiff's evidence as to damages or the amount of loss failed to separate those losses admittedly attributable to the flood alone from the loss sustained because of explosion. This contention is also developed in support of assignments of error in defendants' motion for a new trial, which motion the trial court overruled. Herein, in urging the propriety of the trial court's sustention of their motion for judgment, and in alleging error of the trial court in overruling their motion for a new trial (Hughes v. St. Louis Nat. League Baseball Club, 359 Mo. 993, 224 S.W.2d 989), defendants contend and had assigned error of the trial court

in submitting the issue of damages. It was assigned in the motion for a new trial and is asserted herein that the evidence failed to support a separation of damages; that the damages were excessive; and that no evidence supported the instructions.

Plaintiff had the burden of proving prima facie (and of establishing) the amount of its loss due to explosion alone. Niagara Fire Ins. Co. v. Muhle, 8 Cir., 208 F.2d 191; General American Ins. Co. v. Thompson, Tex. Civ. App., 78 S.W.2d 727.

Plaintiff's secretary-treasurer, and others, testified of plaintiff's work in the "cleanup" and restoration of the elevator to operation. This was accomplished by September 21, 1951. Plaintiff's current inventories showed the amount of grains—wheat, corn, and grain sorghums—on the date of the flood of July 13th. "Weighups" during and subsequent to the cleanup determined the amount of the grain not damaged or destroyed. Plaintiff's secretary-treasurer was able to cause and supervise the computation of the quantity and market value of the respective types of all of the grains which were damaged or destroyed and to compute the approximate quantity and market value of the respective types of grain which would have been damaged in the bottoms of the bins had none of the grain been damaged or destroyed by occurrences other than the flood. It was computed that the total loss in grains due to the flood "and these other casualties" was $402,014.91. The loss that would have taken place had nothing occurred but the flood was computed in the amount of $75,992.76; the latter amount subtracted from the total loss left a balance of loss purportedly due to explosion in an amount of $326,-022.15. In arriving at the amount of the loss ($75,992.76) attributed to the flood—by one computation, the percentage of the different grades of all grain loss having been determined, it was assumed the same ratio of grades was flooded and damaged in the bin bottoms had there been no other casualty; by another computation, the number of bins which had contained each grade of grain was ascertained, and the total of the approximate number of bushels of each grade per bin which would have been damaged had no other casualty occurred was determined. The number of bushels per grade so determined was multiplied by the price per bushel per grade. There was little difference in the results obtained by the two [926] computations. Obviously, these computations would not show such ratio of loss between grades with precision, but in the circumstances that no exact separation could be shown, we are satisfied these computations provided a way for the jury to determine the separation with reasonable certainty.

Plaintiff was able to salvage quantities of damaged grain. Some was sold to farmers for use as feed for livestock. The original amount received for this salvaged grain was $20,818.46; from this sum receipts for salvage, which it was said would have been wetted and damaged had no casualty occurred other than the flood, were deducted, leaving

an amount to be credited in the sum of $17,175.23. As stated, the computations were made under the direction of plaintiff's secretary-treasurer, who verified their correctness. These computations reflecting the result, $308,846.77, plus interest, comprise the amount of the jury's computations and verdict on Count I.

Plaintiff's secretary-treasurer testified that had there been no casualties other than flood, the elevator could have been put in operating condition in approximately ten days, and although there was very little business that could have been done in the first ten days after the flood, things "began to get going again" after ten (or fifteen) days. He doubted there would have been any appreciable reduction in plaintiff's gross earnings had there been no damage other than by the flood, because plaintiff within a few days could have cleaned, disinfected and used its installations and exploited the then current harvest and storage of grains. The witness spoke of other elevators which had not been damaged and which enjoyed after the flood "a very excellent business as a result." In effect, the testimony was that plaintiff would not have suffered any substantial reduction of gross earnings had there been no explosion. Consequently, the amount of reduction of gross earnings had been computed by accountants by subtracting plaintiff's gross earnings for the fiscal year ending April 30, 1952, from plaintiff's average gross earnings enjoyed and experienced in its business during the three immediately preceding fiscal years ending April 30th of 1951, 1950, and 1949, and to the result there was added $59,007 for monies expended in bringing the elevator into operating condition, or, as plaintiff would say, in reduction of the period of interruption of business (an item within the coverage of the insurance certificates), and $10,052.79, received by plaintiff in sales of salvaged grains consummated since the institution of this action, was deducted. The ultimate apparent result of these computations, as found by the jury, was $332,422.21, which sum, plus interest, comprised the amount of the jury's award on Count II of plaintiff's petition.

The computations which we have summarized seem to afford bases for a fairly certain separation of damages, save and except the item of $59,007, and interest thereon, which quite apparently was allowed by the jury in reimbursing plaintiff for expenses "necessarily incurred by plaintiff for reduction of the loss due to such interruption of business by explosion - - -." We are of the opinion an amount of the verdict equaling this item, and interest thereon, should not have been allowed. In plaintiff's cleanup and restoration operations, regardless of whether a hopper bottom of a bin had been detached, all grain had to be taken out of the bin. The undamaged grain had to be removed from all of the bins and all bins were required to be cleaned and disinfected, and the good grain returned to the cleaned and disinfected bins. In the instances where the hopper bottoms were

not expelled, holes were cut in the metal of the hopper bottoms and a draw-off "sleeve jacked through the grain that had been wetted and since crusted over." The undamaged grain was then . drawn from the bins by a screw conveyor; but the caked or crusted and damaged grain had to be dug out with pickaxes; the holes in the metal hopper bottoms were of necessity replaced by replating [**927**] or welding. Other substantial restorations and repairs, too numerous to enumerate, were not made necessary by any casualty other than flood. It seems clear that plaintiff did not and could not separate those expenses for restorations and repairs made necessary by flood in effecting the resumption of its business from those expenditures made necessary by explosion. We consider this failure to prove that part of the $59,007 expenditures made necessary by explosion amounted to a failure of proof as to that whole item, and that the trial court erred in submitting the "reduction of loss" issue. However, we see no reason that such error may not be corrected by remittitur.

■ (In connection with the contention of defendants that the trial court erred in overruling defendants' motion for a new trial, defendants assert error in ignoring or failing to submit the application of a contribution clause contained in the certificates covering loss due to business interruption. It would seem defendants have the laboring oar on this appeal in alleging and supporting the allegations of error in overruling defendants' motion for a new trial. Hughes v. St. Louis Nat. League Baseball Club, supra. The particular point relating to the contribution clause is not included in defendants' points and authorities supporting defendants' allegations of error. It is merely mentioned in the printed argument without development and without citations of authorities as required by rule.)

■ Plaintiff contends the trial court erred in ruling, and defendants contend the trial court correctly ruled, that plaintiff was estopped to relitigate the issue of explosion. These contentions involve questions governed by principles of the doctrine of *res judicata.* The contentions require the examination of the record of a case tried in the United States District Court, District of Kansas. That case involved an action instituted by plaintiff against its lessor, City of Kansas City, Kansas, and lessor's assignee, The Minnesota Avenue, Inc., hereinafter sometimes also referred to as "lessor," to recover on lessor's covenant to repair. The lease also contained a provision requiring lessors to use for repairing all the proceeds, if necessary, received from any insurance policy covering a hazard causing damage to the elevator installations. After the institution of the instant action, defendants-lessors had by leave brought in insurers (defendants in the instant case) as third-party defendants. Although plaintiff had originally alleged damages to the elevator installations were due to flood and explosion, plaintiff amended its original complaints to allege the damage was due to flood and otherwise. Plaintiff was not the

insured in the policies issued to lessors indemnifying for damage to the elevator facilities due to explosion, and the issue of explosion was not essential to plaintiff's recovery on its claim against lessors.

Insurers, third-party defendants in the Kansas case, filed answer, and counter-claim and cross-claim in two counts. In Count I the insurers sought a judgment against *plaintiff* and lessors declaring that damage was not due to explosion. The prayer for relief was as follows,

"- - -, Third-Party defendants pray for a declaratory judgment adjudicating *that no damage claimed in plaintiff's complaint and amended complaint was caused by explosion*; that Third-Party defendants are not liable on policies of insurance referred to in Third-Party complaint and amended Third-Party complaint, *and that plaintiff* and the Third-Party plaintiffs, and each of them, *be enjoined from prosecuting any claim against Third-Party defendants,* or any of them, *in respect to the above-referred subject matter*; and for such other and further relief as is just and proper." (Our italics.)

In Count II of their counterclaim and cross-claim, insurers sought a judgment against plaintiff declaring there was no explosion [928] and no liability to plaintiff under the policies which are involved in the instant action.

Plaintiff had been objecting to the third-party procedure. Plaintiff was also, in effect, contending the jurisdiction of its case against insurers was in the Circuit Court of Jackson County, Missouri, wherein the instant action was then pending. Plaintiff was further urging it should not be required to make common cause with lessors on the issue of explosion, inasmuch as lessors in their original answer to plaintiff's original complaint and in their original third-party complaint denied that any of the alleged damage referred to in plaintiff's complaint was in fact caused by explosion.

The District Court ordered a trial of the issues of plaintiff's claim against defendants-lessors, of the issues of lessors' claim against the insurers, and of the issues of insurers' claim stated in Count I of their counterclaim and cross-claim against plaintiff and lessors. It was further ordered that trial of the issues raised in Count II of the counterclaim and cross-claim, "*and further consideration of the question whether any trial should be had in this court* (as to Count II), will be deferred until after trial of the issues referred to in the preceding paragraph of this order." (Our italics.)

Upon trial of the issues so ordered, plaintiff introduced evidence tending to support its claim; lessors introduced evidence tending to defeat plaintiff's claim and tending to support their claim against insurers; and insurers introduced evidence tending to defeat lessors' claim against them and tending to support their claim for a declaratory judgment against plaintiff and lessors. At this stage of the trial proceedings, plaintiff filed a motion for a directed verdict

in its favor on Count I of insurers' counter-claim and cross-claim. After argument on the motion, the District Judge questioned insurers' counsel, as follows, "But the question now is you are asking apparently in your first count of the cross-claim in effect for a judgment against the grain company which did not purchase the policy and apparently has no interest in the policy." Insurers' counsel disclaimed any such intention. The judge remarked, "Of course we are under the main issue in the case. We are certainly trying the issue of liability of the insurance companies to the City and Minnesota Avenue, Inc., under the policies of insurance issued to them. That is all we are trying, isn't it?" Whereupon the court was about to sustain plaintiff's motion for a directed verdict, but insurers' counsel asked leave to amend Count I "so that it confines the counterclaim to those policies under that count (Count I) that were issued to the City and Minnesota Avenue and as to the other count (Count II) which you are not trying now, that that is confined of course, to the policies issued to the grain company. - - - Let me withdraw that from the pleading. - - - I would prefer to withdraw it from the pleading so it would not necessitate having that kind of an order based on a pleading that apparently there was a mistake in, and I would like to correct that and that would eliminate the necessity of any order on it." The prayer of Count I of insurers' counter-claim and cross-claim was subsequently amended by leave so as to pray for the relief, as follows,

"- - -, Third-Party Defendants pray for a declaratory judgment adjudicating that no damage claimed in Third-Party Plaintiffs' complaint and amended complaints was caused by explosion; that Third-Party Defendants are not liable on policies of insurance referred to in Third-Party complaint and amended Third-Party complaints, and that the Third-Party Plaintiffs, and each of them, be enjoined from prosecuting any claim against Third-Party Defendants, or any of them, in respect to the above-referred subject matter; and for such other and further relief as is just and proper."

At the conclusion of the trial, factual issues having been submitted to a jury, a [929] verdict was returned for plaintiff against lessors for an amount which the court modified, and judgment was rendered for plaintiff for $95,032.88 on plaintiff's claim against lessors. The jurors had not agreed upon an answer to the special question submitted—"Did any explosion or explosions occur following the infiltration of flood waters into the River Rail Elevator in July of 1951." —however, the District Court thereafter sustained insurers' motion for judgment in accordance with their motion for a directed verdict interposed at the close of all the evidence as to lessors' claim against insurers—a ruling, in effect, that lessors had failed to make out a case on their third-party complaint against insurers for loss due to ex-

plosion—and judgment was rendered in favor of insurers and against lessors on their claim for insurance.

We are of the opinion the judgment rendered in favor of insurers and against lessors on lessors' claim concluded neither the ultimate issue of liability nor any essential supporting issue of plaintiff's claim or cause of action against insurers on the policies involved in the instant case. A judgment is not generally a bar under the doctrine of *res judicata* to the further prosecution of claims or demands which were excluded by the court, and, therefore, were no part of the verdict and judgment. Neither is a question concluded by a judgment if it was withheld, or, although originally in issue or involved in an action, if it was excluded, withdrawn or ruled out by the court and which, therefore, was not a part of the verdict or finding and final judgment in a case. Patterson Oil Terminals v. The Port Covington, 3 Cir., 205 F.2d 694; Duval v. Duval, 316 Mo. 626, 291 S.W. 488; Cox v. Imes, Mo. App., 219 S.W. 399; Vol. 2, Freeman on Judgments, 5th Ed., §§ 703-704, pp. 1483-1488; 50 C.J.S., Judgments, § 729, pp. 217-218.

It is true that in the trial of the issues of lessors' claim or cause of action against insurers an essential issue was "explosion." Defendants herein urge that whether or not plaintiff and lessors in the Kansas case were in direct privity, plaintiff was "sufficiently close" to lessors to be bound by the adjudication of "no explosion," in the District Court's adverse ruling on lessors' claim against insurers. And again defendants say the true reason for holding an issue concluded by *res judicata* does not necessarily depend on privity, "but on the policy of the law to end litigation by preventing a party who has had one fair trial of a question of fact from again drawing it into controversy." Taylor v. Sartorious, 130 Mo. App. 23, 108 S.W. 1089. As we have noticed, the District Court in considering the sustention of plaintiff's motion for a directed verdict was of the view that plaintiff had no interest in the policies issued to lessors; and the judge also expressed the opinion that, apparently, there was no privity of contract claimed or asserted under which plaintiff would have any rights under the policies of insurance issued to lessors. Clearly plaintiff would have had no property right in any proceeds of such policies. The best that can be said for lessors on this phase of the argument is that lessors were obligated by their lease to use, if necessary, any proceeds of lessors' policies in the repair of their own elevator facilities leased to plaintiff. We think this is not of sufficiently "close" contractual relationship as to conclude plaintiff by the adjudication adverse to lessors on the issue of explosion in the situation here. We have also ascertained from the record of the Kansas case that plaintiff, after insurers had amended Count I, did not introduce evidence in refuting insurer's evidence tending to show "no explosion"; and, as we see it, there was no judgment entered adverse to plaintiff from which plaintiff could have perfected an appeal. It could hardly be

said that plaintiff had a trial of that issue in the Kansas case. This, because we think the District Court withheld the issues of plaintiff's claim herein from the [930] trial and judgment entered in that case. Of course, it is the policy to end litigation where a party has had a fair trial on factual issues; but policy does not go so far as to deny a plaintiff a fair trial of issues supporting his separate claim.

As we have seen, insurers in Count I as originally drafted had prayed for a declaratory judgment affecting plaintiff on the issue of explosion, also a decisive or essential issue of a trial of plaintiff's claim or cause of action on its policies of insurance involved in the instant case. According to insurers' counsel, the original draft designed to affect plaintiff, was an inadvertence, and counsel requested the District Court to withdraw the issue and was granted leave to amend so that the issue of ''no explosion'' purportedly raised against plaintiff was withdrawn or eliminated; whereupon plaintiff and insurers, if ever, were no longer adversary parties on the issue in the separate trial of the issues as ordered by the District Court. The District Court for the time had put aside the consideration of insurers' cross-claim (Count II) against plaintiff as to the policies involved in the instant case. It is our conclusion that insurers' counsel, when confronted with a probable adverse ruling, requested the withdrawal of the explosion issue by amendment in so far as the issue affected plaintiff; and that the District Court permitted the amendment and reserved or withheld or limited the effect of the trial of the issues in the District Court with respect to plaintiff so that the judgment for insurers against lessors did not affect or bar plaintiff's claim or cause of action and right of recovery on the policies involved in the instant action.

The judgment for defendant should be reversed, and, if plaintiff will within fifteen days enter a remittitur of $71,005.12 ($59,007 plus $11,998.12, interest thereon to the date of the original judgment for plaintiff, February 4, 1955), the original judgment for plaintiff should be affirmed for $698,517.62 as of the date of the entry of such original judgment; otherwise, the cause should be remanded for a new trial.

It is so ordered. *Coil* and *Holman, CC.,* concur.

PER CURIAM:—The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All the judges concur.