No. 40,327

CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, a corporation, *Appellee,* v. AETNA INSURANCE COMPANY, a corporation, et al., *Appellants.*

(308 P. 2d 119)

Opinion filed March 9, 1957.

*Donald N. Clausen,* of Chicago, Ill., and *Donald C. Little,* of Kansas City, argued the cause, and *Frank L. Bates,* of Kansas City, was with them on the briefs for the appellants.

*Clayton M. Davis,* of Topeka, argued the cause, and *Mark L. Bennett,* of Topeka, and *Thomas M. Van Cleave, Willard L. Phillips, Thomas M. Van Cleave, Jr.,* and *James J. Lysaught,* all of Kansas City and *Ralph M. Jones,* of Kansas City, Missouri, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Robb, J.: This was a damage action brought by plaintiff to recover under an insurance policy issued by forty-seven defendants under the name and style of the Underwriters Grain Association. The jury returned a verdict for plaintiff, the trial court set the verdict aside, granted a new trial, and defendants appealed from the order of the trial court overruling a demurrer to plaintiff's evidence and a motion for a directed verdict in favor of defendants.

Appellee will be referred to as the insured and appellants as insurers.

There is no dispute involving the pleadings and they will not be set out herein.

The first error complained of by the insurers is the order of the trial court overruling their demurrer to insured's evidence based on the ground that the evidence failed to prove the allegations of the petition, or to prove a cause of action in favor of insured and against the insurers.

While the entire policy in the sum of $1,311,000 covered four Rock Island grain elevators designated as A house, B house, C house and D house, we are presently concerned only with the unit called C house.

The salient parts of the stipulation of facts were that C house, which had been built in 1914, was of concrete construction, reinforced with three-quarter inch twisted square steel rods averaging one foot apart; it was the most westerly of the buildings located in the Armourdale district of Kansas City, Kansas, and was adjacent to the Seventh street viaduct and approximately 600 feet east of the Mill street viaduct; the walls were approximately seven inches thick but the thickness varied with the size of the nineteen bins which were round, were ninety-three feet in height and had an inside diameter of twenty-four feet; in the spaces between the round bins were interstice or "star" grain bins; on the south side of C house were eight partially circular bins, five of which were divided by a center partition from the outer wall to the back wall; all bins were open at the top but were protected by the roof of C house, which was thirteen feet from the top of the bins; the conical bottoms of the bins rested upon a sand fill and a concrete slab about a foot thick which served as a ceiling for the basement.

The stipulation further showed that the Armourdale district was inundated by flood waters of the Kaw (Kansas) river commencing about 11:00 p. m. on July 12, 1951, which entered C house basement between 5:30 and 6:30 a. m. on July 13, 1951; before noon on the 13th the flood waters had risen to within a few inches of the second story windows of the C house offices at the west end; by 2:30 p. m. that day the water had risen to within two or three feet of the maximum crest; the crest was eighteen feet and five inches at the west end of the elevator and twenty-two

feet at the east end and remained so until 2:00 p. m. on July 14, 1951, at which time the water noticeably began to recede until it reached ground level on July 18, 1951; C house was constantly subjected to swift water current and the water inside rose to a height of at least eighteen feet; the bins in C house contained wheat, corn, and milo; and finally, it was stipulated that the insured had expended $95,922.80 in repairs.

Insured's oral evidence was attacked by demurrer and pertinent parts thereof will be subsequently referred to herein. There was also photographic and documentary evidence but it will not be set out for the reason that the oral evidence sufficiently covers the two propositions raised by the demurrer; (1) whether plaintiff's damage was directly caused by an explosion and (2) whether the occurence resulted from a hazard inherent in the conduct of the grain elevator business.

As stipulated, the policy of insurance did not cover flood loss but was only a fire insurance policy. However, an endorsement, termed an "inherent explosion clause" had been added to the policy. It reads:

"1. In the interest of the insured, the condition of this policy excluding loss from explosion is hereby modified, and in consideration of the rate at which this policy is written, this Company shall be liable for any direct loss to the following described property (only while said property is covered by this Policy).

"As Shown In Coverage Clause Above
[property described]

"(No liability is assumed except on property described in this Space) *caused by explosion* occurring in any part of the plant, of which the building(s) covered hereunder or containing the property covered hereunder, form a part. *Provided, further, that in each and every instance the explosion results from the Hazards inherent in the business as conducted therein and not otherwise and except as hereinafter provided.*

"2. *Exclusions:* This Company shall not be liable for loss occasioned by or incident to the explosion of steam engines, steam or hot water boilers, steam pipes, water heaters, or their connections caused by internal steam or water pressure; nor for loss occasioned by the explosion of internal combustion engines, fly-wheels, pulleys, abrasive wheels or moving or rotating parts of machines, unless fire ensues and then shall be liable for loss by fire only." (Our emphasis.)

Carl C. MacFarlane testified as an engineer for the firm that repaired the elevator damage and stated that on the south side of C house two or three large holes started at the ground and extended approximately twenty feet high to the water line; they

were several feet in length; there was a very bad puncture in the northwest corner bin; two or three places had opened up in the north side where the wall had been parted; on the east side there was an opening to the north and a hole about the center near ground level; it was necessary to go back further (into the concrete) because where ruptured the concrete was too disintegrated, by dint of whatever happened, to pick up steel and make a durable engagement of the new concrete to the old; he concluded excessive pressure caused the failure of the bins; he assumed and thought "it went out suddenly."

Robert G. Long, an experienced concrete worker, testified that the concrete breaks were caused suddenly rather than slowly.

Harry Wright, a deputy sheriff, who had been a demolition expert with the army in Europe and Africa from 1941 to 1945, and who was well-acquainted with explosive sounds, noticed nothing unusual about the elevator until the morning of July 14 when, while stationed on the Mill street viaduct, he heard a distant roaring or thunder-like sound; then he felt the bridge shake and vibrate; he had heard no other such sound nor had he felt any similar movement of the bridge either before or after; the noise from the elevator was a rumbling one similar to underwater explosions he had previously heard.

Donald William Clark was on the Mill street viaduct and testified similarly to the above witnesses. In addition, he stated that later when he went down close to the elevator where he had seen grain dust or vapor, there was "kind of a sour smell in the air there."

John Phelps, who had also been on the Mill street viaduct, testified to the sound and vibration as did the other witnesses, and further stated that in observing holes in the elevator after the sun came up that morning he noticed iron reinforcing rods sticking right straight out; that the concrete was stripped off with only a few pieces hanging, but you could not see the actual concrete; it had been blown off; the concrete that had come out of the holes was strewn about fifteen or twenty feet *south* of the elevator; the rapid flow of the water was to the *east*; to him the sound was not a sharp report, but was a dull thud just like shooting dynamite quite a ways down in a hole, *muffled.*

L. D. McDonald, a consulting engineer who had had much experience with blasting and explosives and understood the results

thereof, examined the elevator subsequently and found the concrete had been scattered and sheared from the steel and had apparently been moved to a considerable extent; that the major portion had been moved ten or fifteen feet from the elevator; there had been a sudden snap without a doubt because the bars could not have been broken without a sudden break; the result was caused by great pressure and there had been quite a violent break; from his examination of the structure and tests he had conducted as to compressibility or elasticity of grain, he concluded the breaks were sudden and abrupt; if slow pressure were continued, causing a slow break, when it was adequately opened to let the wheat flow out, the break would stop right there; from his years of experience in breaks and failures, both in testing and in actual construction, his opinion was this was a very abrupt, explosive break judging from the physical condition of the broken structure and the extent to which the concrete had been moved.

Doctor Frederick Kurata, a faculty member of the University of Kansas, and an expert in chemical engineering, had conducted experiments with grains and containers. He testified that the grain when wet became spongy, expanded, and broke a glass container with a snap too rapid for visual observation which scattered glass twelve or fifteen inches from the center of the container; maximum expansion occurred thirty to fifty hours after grain had been wetted, and gases began to form between five and six hours after the grain had been wetted; the expansion was detectable after the container burst; a constant pressure with a gradual opening would stop when the grain flowed out; in such an instance there would not be naked steel reinforcement or gaping holes in the side of a structure; the hydrostatic pressure of the water amounted to nothing compared to the pressure of the grain when wet; anything could have set off the "blow-out"; pressure began as soon as water was added to the grain and it developed rapidly from seven to about twenty hours and then gradually increased until it reached the maximum; when grains were soaked with water for four or five hours bacterial action took place and gases were generated which were explosive and they could be a contributing factor in determining a result; the gas would be sixty per cent carbon dioxide and forty per cent hydrogen and would not be combustible in the absence of oxygen; there was no suggestion of a flame but there would be gas pressure; the wet

grain would form a gelatinous impermeable mass which would retain the gas; since water had gotten into the elevator, the gas could have gotten out unless such a solid gelatinous mass impermeable to gas was formed.

There were other witnesses on the Mill street viaduct whose testimony was similar to that summarized above.

In determining whether there was evidence to establish the fact that what happened was an explosion, we are reminded of the rule that all the evidence will be considered as true, it will not be weighed as to contradictory parts or discrepancies therein between direct or cross-examination, or among the witnesses, and every favorable inference which may reasonably be drawn therefrom will be given to such evidence. If there is any evidence adduced which sustains the case, the demurrer will be overruled. (*Noel v. Menninger Foundation*, 180 Kan. 23, 299 P. 2d 38.)

Webster's New International Dictionary, Unabridged, 2d ed., defines explosion as,

". . . a violent bursting or expansion, with noise, following the sudden production of great pressure . . . or a sudden release of pressure. . . ." (p. 898.)

See, also, Black's Law Dictionary, 4th ed., p. 689.

It is recognized that the word *explosion* has no definite meaning in ordinary speech or in law. It may and does vary in degrees of intensity and in the vehemence of the report, and it is not always due to the presence of fire. Explosion may result from decomposition or chemical action. (*Vorse v. Jersey Plate Glass Ins. Co.*, 119 Iowa 555, 558, 93 N. W. 569, 60 L. R. A. 838.)

For further discussion of the term *explosion* see 15A Words and Phrases, perm. ed., 478. In the same volume *burst* is defined as:

". . . a sudden breaking forth; an 'explosion'; and an 'explosion' is a discharge; an outburst. Helmbacher. Forge & Rolling Mills Co. v. Garrett, 119 Ill. App. 166." (p. 479.)

For further definitions, see 35 C. J. S., *Explosion*, 215, 216; 12 C. J. S., *Burst*, 760; 22 Am. Jur., Explosions and Explosives, § 2, pp. 126, 127.

Insurers rely on authorities dealing with circumstantial evidence and piling an inference on an inference, but we cannot agree that all the evidence, as that portion set out herein shows, is circumstantial. The witnesses testified directly as to what each one saw, heard and felt. They testified not only as laymen but some of

them had had actual experience with explosions to which the occurrence here could be compared. The three witnesses who testified as experts used the words *burst* and *explosion* interchangeably. From the above definitions the words appear to mean practically the same thing even to the extent that many authorities state they are synonymous. (12 C. J. S., *Burst,* 760.)

Insurers further rely on *Allen v. Ins. Co. of North America,* 175 Pa. Superior Ct. 281, 104 A. 2d 191, wherein a fuel oil delivery man, while filling an oil storage tank in a basement through an outside intake pipe, noticed the curtains on the basement door move but heard no sound and saw no smoke or sprayed oil. The air vent on the tank was working in a normal manner. The court there said that in making this argument the insured apparently conceded the evidence did not establish an explosion because he relied on a proposition the insurers intended by the policy that the terms *explosion, rupture* or *bursting* were to be regarded as synonymous. We have an entirely different case here and the Allen case is not persuasive on the point.

Our attention is called to *Gerber v. McCall,* 175 Kan. 433, 264 P. 2d 490, where this court held that the 1951 flood was an Act of God and unprecedented, and recovery was denied. The Gerber case was couched on a negligence theory and the problem there presented was not similar to the one we have here.

There is no argument that the policy covers explosion as shown in the definitions previously set out herein. Should there be such an argument it would find solution in the rule that where a provision of an insurance policy is susceptible of different constructions, it is to be construed most favorably to the insured, and if an insurer intends to restrict the coverage of a policy it should use language clearly stating its purpose. (*Miller v. Farmers Mutual Automobile Ins. Co.,* 179 Kan. 50, 292 P. 2d 711.)

The terms of any insurance policy will be construed in their plain, ordinary and usual sense (*Bennett v. Conrady,* 180 Kan. 485, 305 P. 2d 823) and in this type of policy the use of the word *explosion* is understood in the sense that ordinary men, not scientists, use it. So used, it means something different from a mere burning. If a policy is drafted so as not to exclude a certain kind of explosion, it will be held to be covered. An insurer is bound by a clause covering all damage caused by explosion and modifying a condition of a fire policy excluding loss from explosion. (Appleman's Insurance

Law and Practice § 3085, 5 Couch on Insurance, 1956 Pocket Supp., § 1197; 6 Couch on Insurance, § 1279; Volume II 1945 Cum. Supp. to Couch on Insurance, § 1197.)

Avoidance of liability under an explosion clause of a fire insurance policy such as we have here on the ground that no explosion took place has been sought by the insurer in a number of cases, in the majority of instances unsuccessfully. (1956 Cum. Supp. of 29 Am. Jur., Insurance, § 1021.) Many cases supporting this proposition are included in an annotation in 28 A. L. R. 2d 995-1006. We will not burden this opinion by analyzing all the cases there cited except *Lever Bros. Co. v. Atlas Assur. Co.*, 131 F. 2d 770, 28 A. L. R. 2d 995, 1002, which seems to have been a landmark case as it is frequently referred to by courts and also textwriters in disposing of questions of the type with which we are here confronted. In the Lever case recovery was sought under an explosion endorsement in a fire insurance policy for the bursting of a tank of cottonseed oil. It was there held a jury is entitled to consider expert testimony in connection with all other evidence including the impression the bursting made upon witnesses who saw and heard it and who afterwards observed physical facts and the nature of the damage wrought, together with reasonable inferences to be drawn from facts proved. In view of surrounding circumstances, whether the theory of the insured—that water at the bottom of the tank had become superheated and suddenly converted into steam which resulted in an explosion, or faulty construction of the tank and building up of several different stresses caused the rupture in the tank—should be adopted, was for the jury.

In view of all that has been here said we are constrained to hold that the evidence made a prima facie showing of an explosion.

In a further effort to avoid liability, insurers here claim that the evidence fails to show a theory of an inherent hazard but we cannot agree there was no evidence to support the contention by insured that the explosion was connected with a hazard inherent in conducting the grain elevator storage business. We refer to but will not repeat the testimony of expert witnesses heretofore set out.

We are unable to see any similarity between *Davies v. Hartford Fire Ins. Co.*, 75 F. 2d 442, also cited by insurers, where the insured deliberately and maliciously caused an explosion with the intent to destroy a house and its contents, and the case now under consideration. Such a comparison was attempted without success in

*Gerrity v. Charter Oak Fire Ins. Co.*, 82 F. Supp. 631, where the issue was negligence and carelessness in the handling of apparatus. (P. 633.)

There is something additional to be said on the inherent explosion clause whereby the previously-stated rule would be more applicable. In paragraph No. 2. *Exclusions* (heretofore set out) the insurers definitely and clearly excluded certain explosions where fire was absent so that if they had also intended to exclude the type of explosion under consideration here, then it should have been clearly and definitely so stated in the policy. Otherwise, the policy will be deemed to cover such a risk.

Another question raised which merits attention is whether there was proof of damages. We think there was. At the outset the amount expended by insured in restoring the structure was stipulated and in addition thereto the record shows the witness Mac-Farlane testified that materials used and the manner of doing work at the time the repairs were made were of superior quality and caliber than they were when the elevator was first constructed. After testifying that the elevator was in no better shape than it was previously, he compared their repair work to a welding job which is no better than the parent material. The entire job involved a period from October, 1951, to March, 1952, wherein there was included completion of other work which was not a part of the amount sought herein. This evidence would not substantiate insurers' contention that the only way the jury could arrive at a verdict would be by conjecture and speculation. In view of this, we are unable to say there was no evidence to show damages and even though there may have been some conflict between the direct and cross-examination of this witness, which we are not now determining, the rule previously stated would govern our consideration of the demurrer.

We are of the opinion the trial court was correct both in overruling the demurrer and in overruling the motion for directed verdict. Any other controversial matters complained of were corrected by the trial court in its order granting a new trial.

The judgment is affirmed.