AETNA CASUALTY & SURETY COMPANY and others, Appellants, v. OSBORNE-MCMILLAN ELEVATOR COMPANY, Respondent.

*January 4—February 2, 1965.*

For the appellants there were briefs by *Francis J. Wilcox* and *Wilcox & Sullivan,* all of Eau Claire; by *Donald N. Clausen* and *Clausen, Hirsh, Miller & Gorman,* all of Chicago, Illinois; and by *R. E. Anderson* and *Hughes, Anderson, Davis & Witkin,* all of Superior; and oral argument by *Francis J. Wilcox.*

For the respondent there was a brief by *Peter Dorsey, William A. Whitlock,* and *Dorsey, Owen, Marquart, Windhorst & West,* all of Minneapolis, Minnesota, and by *Robert H. Gee* and *Powell, Sprowls & Gee,* all of Superior, and oral argument by *Robert H. Gee* and *Peter Dorsey.*

HALLOWS, J. This appeal raises the question of what is an explosion as that term is used in the insurance policies applied to the insured's business of storing and handling grain in Superior, Wisconsin. The word "explosion" is not defined in the policies but the exclusion clause of the endorsement provides: "Loss by explosion shall include direct loss resulting from the explosion of accumulated gases or unconsumed fuel within the firebox (or combustion chamber) of any fired vessel or within the flues or passages which conduct the gases of combustion therefrom. However, this Company shall not be liable for loss by explosion, rupture or bursting of: (a) steam boilers, steam pipes, steam turbines or steam engines; or (b) rotating parts of machinery caused by centrifugal force; . . . The following are not explosions within the intent or meaning of these provisions: (a) concussion unless caused by explosion, (b) electrical arcing, (c) water hammer, (d) rupture or bursting of water pipes."

The tank in question was erected in the fall of 1958, on a re-enforced concrete platform and was located between a battery of concrete storage bins and the three other steel tanks which extended in a line along a slip in Superior bay. The tank was a monolith constructed by welding steel plates together to form the wall which was welded to a base plate. The circular base plate was constructed by welding the ends of eight-foot-long narrow plates ¾ths of an inch thick and this base plate was secured to the concrete platform by some 128 bolts placed two feet apart in a circle having a diameter

of approximately 80 feet. The bolts were embedded in the concrete and their threaded ends extended from three or four inches above the concrete surface of the slab. The tank was 80 feet high and a conical steel plate set on steel rafters formed its roof. An enclosed gallery containing a conveyor belt was connected to the concrete bins and ran across the top of all four steel tanks.

The tank was adequately designed to support and contain 361,000 bushels of number one dark northern spring wheat with a conventional margin of safety. The tank had been filled during June of 1961 when the air temperature was around 93 degrees. The last movement of the grain was on June 29th, when 4,000 bushels of wheat were removed. On January 17, 1962, the tank contained 361,000 bushels of wheat which weighed 60 pounds per bushel, or 21,660,000 pounds. Shortly before 1 a. m., when the temperature had reached approximately 27 degrees below zero after having fallen from 30 degrees above zero at 6 p. m. on January 13th, the tank suddenly burst into three major segments.

There is no substantial disagreement in the expert testimony that the initial fracture of the tank started at the bottom of the tank wall over a discontinuity or "notch" in the base plate which was caused by an incomplete weld where a small filler plate 3/4th-inch wide had been placed to fill a gap between two sections of the base plate. The steel plate and tank were brittle because of the sudden drop in temperature and because of the low temperature the steel had lost most of its ductile qualities. It was generally agreed in the evidence this steel tank would normally contract more than two inches in circumference from its size at 93 degrees during a drop in temperature to 27 degrees below zero. The experts agreed that the stresses present in the tank wall from contraction instead of distributing themselves equally throughout the wall necessarily flowed around the notch where they became concentrated and too great for the cold

steel to withstand. The wall of the tank split from bottom to top through the plates and not following the welds. Following the initial fracture the other two fractures almost instantaneously occurred. This fracturing consumed one-tenth of a second or from one twenty-fifth to one-fiftieth of a second, and all the movement of the grain and the metal tank ceased in about two seconds.

After the occurrence one segment of the tank weighing approximately 87,100 pounds was at its nearest point 108 feet from where it has been attached to the concrete platform. Another segment weighing approximately 75,921 pounds was wrapped backward around an adjoining steel tank which was caved in about 13 inches to a height of 30 feet and a distance of 22 feet along its circumference. The third segment weighing approximately 145,163 pounds was found in the slip adjacent to the pier on which the tank had been located. The bottom course of this segment was 94 feet from where it had been attached to the concrete platform. Of the 128 steel anchor bolts, about half of them had snapped in tension and the other half had been sheared off. A portion of grain was found 187 feet from the outer edge of the tank and generally covered a larger area than such volume would in a conical shape of repose. Nor is there any question that when the tank gave way, a loud noise and ground vibration were produced. Witnesses testified they heard a "terrific crash," "a giant roar," "a sudden capow—something hit," and "a loud sound comparable to that made by a jet hitting the sound barrier."

At the close of the trial the insurers moved for a directed verdict and on this appeal contend that the evidence did not show an increase in the internal pressure or force over that of weight and position of the grain in the tank, that the first fracture of the wall of the tank was a cold-weather-brittle fracture initiated by an incomplete weld, that the latent or potential energy in the stored grain was not con-

verted to active or kinetic energy until after the fracture split the wall and therefore although there was suddenness in the occurrence accompanied by noise, there was no explosion. The insured argued then as now that the evidence presented a jury question of whether an explosion had occurred and that it was not necessary to have an increase in internal force in the grain to constitute an explosion.

The trial court although inclined to agree with the insurers nevertheless submitted the case to the jury adopting in its instructions the insured's view of what constituted an explosion. The question presented to the jury was, "Was there an explosion involving Tank A on January 17, 1962?" In instructing the jury the court included Webster's New International Dictionary (2d ed., unabridged 1960), definition, the American College Dictionary definition of an explosion, and then proceeded to give the following synonyms from the Synonyms Finder for the word "explosion:" "Violent bursting with noise, sudden discharge, fulmination, detonation, shock, ignition, shattering sound, concussion, collapse, blast, report, volley, shot, crack, pop." The court also instructed there may be an explosion without a sudden development of internal force or pressure, the pressure need not be unusual or abnormal or suddenly produced, and there may be an explosion without a sudden expansion of the volume of the contents of the contained substance. The trial court on motions after verdict recognized these instructions were tantamount to directing a verdict for the insured but justified them as being correct on the theory "an explosion is what an explosion does" and "an explosion is an idea of degree." We consider the instructions prejudicially erroneous in their interpretation of the word "explosion" in the policies as applied to the facts and especially in including the synonyms.

Because one of the policies insured grain stored in five states, was negotiated in Minnesota and countersigned by a

Wisconsin agent, a preliminary question arose of what state law applied. The court determined the Minnesota substantive law was controlling and no issue is taken with that ruling on this appeal. There appears to be no ruling of the Minnesota supreme court on the question involved and consequently the applicable rule is that when an issue involves foreign law and there is an absence of any foreign decision, the courts of this state must look first to their own decisions as controlling and secondarily to the general law or decisions of other jurisdictions. *Gulbranson-Dickinson Co. v. Hopkins* (1919), 170 Wis. 326, 175 N. W. 93, 94; *De Lorenzo v. Supreme Lodge, Knights of Pythias* (1936), 222 Wis. 141, 268 N. W. 217; *Harper v. Hartford Accident & Indemnity Co.* (1961), 14 Wis. (2d) 500, 111 N. W. (2d) 480. The trial court in its decision rejected *Bauman v. Midland Union Ins. Co.* (1952), 261 Wis. 449, 53 N. W. (2d) 529, and relied on language in *Lever Brothers Co. v. Atlas Assurance Co.* (7th Cir. 1942), 131 Fed. (2d) 770, to the effect that "an explosion is an idea of degree" and an explosion is as an explosion does.

The trial court was in error in not applying *Bauman,* which involved the question of whether a silo burst as a result of an explosion of carbon-dioxide gas formed by the fermentation of the silage or whether the silo was destroyed by reason of its own defects from overloading or from the sheer weight of the silage contained therein. After reviewing the evidence this court stated there was no credible evidence on which a jury could find the bursting of the wall of plaintiffs' silo was caused by an explosion, or by the pressure of gas and therefore it was error not to have granted the defendants' motion for a directed verdict. The plain doctrine of the case is that an explosion as applied to silage in a silo or contents of a container must include the element of an active force independent of or in addition to the force of weight and height of the contents which seek a sudden

and violent release by breaking the container. Static or potential force or pressure resulting only from the weight of the contents in a container may cause a container to split open and release the contents but such an occurrence is hardly looked upon by the average person to be an explosion.

The *Lever Brothers Case* involved a steel tank some 60 feet in diameter and 50 feet in height approximately ⅘ths filled with cottonseed oil weighing 6,292,000 pounds. The plaintiff claimed an explosion occurred when the tank burst as a result of an increase of internal pressure caused by steam from a defective heating coil in the bottom of a tank. The insurer argued the tank failed because of the great stresses within the walls of the container and there was no credible evidence of an increased pressure inside of the tank sufficient to cause an explosion. The court decided there was evidence sufficient to sustain the verdict on the plaintiff's theory and then went on to answer the defendant's argument by stating the container could have exploded because of instability of its walls due to great stresses therein within the common and accepted understanding of the term. We do not agree this view is the common and accepted understanding of an explosion. Such a view confuses an explosion as commonly understood with other phenomena which involve similar destruction or damage.

Most decisions agree the word "explosion" in an insurance policy should be given its common and ordinary meaning by a court. However, a dictionary definition cannot always be taken as controlling. The latest edition of Webster's International Dictionary (3d. ed., unabridged 1961), gives as a definition of "explosion," "a violent expansion or bursting that is accompanied by noise and is caused by a sudden release of energy from a very rapid chemical reaction, from a nuclear reaction, or from an escape of gases or vapors under pressure (as in a steam boiler)." This definition is not quite the same as earlier definitions and in itself would

hardly apply to grain in a storage tank and seems to be confined to nuclear or chemical activity causing pressure. Other dictionary definitions, while helpful, are not decisive; if they were, the judging process would be easy. Many definitions of explosions of varying types may be found in Black's Law Dictionary (4th ed.), p. 689. See also 22 Am. Jur., Explosions and Explosives, pp. 126, 127, sec. 2, and Anno. 28 A. L. R. (2d) 995.

It is argued that the meaning of the word "explosion" is defined indirectly by the use in the exclusion clause of the words explosion, rupture, or bursting in reference to steam boilers, pipes, turbines and engines and rotating parts of machinery caused by centrifugal force. We do not agree that because the terms "explosion, rupture or bursting" are used in a series they are synonymous and that all ruptures and burstings of containers other than steam boilers, pipes, turbines, are explosions. *Allen v. Insurance Co. of North America* (1954), 175 Pa. Super. 281, 104 Atl. (2d) 191. Likewise, because of the exclusion of phenomena such as concussion, electrical arcing, rupture and bursting of water pipes which ordinarily do not constitute an explosion, it cannot be logically argued the meaning of the term "explosion" is thereby enlarged.

There seems to be little dispute in the cases that an explosion as commonly understood is not one element such as an increase in pressure or noise or a result such as a fractured container, but the sum total of several elements not the least of which consists of an active force which suddenly and violently exerts itself in some form. In explodable substances the force exerts itself primarily in the substance through a chemical change or nuclear reaction or other process while in a nonexplodable substance in a container the active force does not change the composition of the substance but acts through the substance in breaking out of the container. In cases of confined substances if the

container fails because of structural weakness so as to let out the contents as distinguished from the contents bursting out because of its force, there is no explosion even though it might be said the tank ruptured or burst open. The probability of grain like water which is not an explodable substance being an element of an explosion consists in its ability to contain or harbor active forces or energy. In explosions involving a nonexplodable substance there must be an internal active force created which breaks out of its confinement. In the case of grain such active force must be in addition to that of the normal static force exerted on the inside of a container because of the weight and position of the grain.

The necessity of the existence of an active force is the distinguishing characteristic of what has been held to be an explosion in the decided cases. In *Bower v. Aetna Ins. Co.* (D. C. Tex. 1944), 54 Fed. Supp. 897, it was held that a hot-water-heating system exploded during cold weather when a radiator burst and water was forced from the radiator. The case was decided on the principle there was "a shattering by a sudden and intense pressure in distinction to rupture; a sudden bursting or breaking up or in pieces, from an internal or other force." Likewise, an explosion was found in *Sargent v. Mechanics Ins. Co.* (1933), 216 Iowa 688, 247 N. W. 267, when a coal-burning furnace having been fixed for the night was found two and one-half hours later with the pipe to the chimney lying on the floor and the furnace door open. In *Crombie & Co. v. Employers' Fire Ins. Co.* (Tex. Civ. App. 1952), 250 S. W. (2d) 472, a leak occurred in the ammonia-valve packing in a refrigeration apparatus. The court found an explosion on the basis the packing had been blown out by the ammonia under a pressure of 190 pounds in the line. Here, an active force caused by the compression was seeking to retransform the liquid to a gaseous state when the container was no

longer able to withstand the pressure. In *American Casualty Co. v. Myrick* (5th Cir. 1962), 304 Fed. (2d) 179, also involving ammonia in a refrigeration plant, the court stated the common characteristic of an explosion of a confined substance was its sudden and with varying degree of violence breaking out of its confinement as a result of internal pressure. In *Jersey Ins. Co. v. Heffron* (4th Cir. 1957), 242 Fed. (2d) 136, the question was whether the walls of a building were blown out in an explosion or simply collapsed, and the court considered an explosion as one of "compression and sudden, violent expansion of air; in other words, a violent release of energy causing a rupture, accompanied by noise."

The increase in internal pressure over the normal static pressure of the weight of the substance requirement or the necessity of the presence of active force is well illustrated in water-hammer cases. In *L. L. Olds Seed Co. v. Commercial Union Assurance Co.* (7th Cir. 1950), 179 Fed. (2d) 472, the court held a water pipe exploded against the argument of the insurer that it merely ruptured because cold water cannot explode. In a water hammer there is an increase in the pressure in the flow of water because of sudden stoppage of water and this active pressure in some cases is sufficient to suddenly break the water pipe. The necessity of "pent up" or buildup of active pressure as an element of an explosion was recognized in *Commercial Union Fire Ins. Co. v. Bank of Georgia* (5th Cir. 1952), 197 Fed. (2d) 455, where the court held the water hammer was an explosion under the facts.

Where there was no sudden buildup of internal pressure or active force in a water pipe and such pressure as existed caused a slow separation of a faucet in a bathroom from the pipe at a slip joint, it was held that the constant exertion of internal pressure which forced the slip joint apart slowly did not amount to an explosion. *Reynolds v. Great American*

*Ins. Co.* (1952), 334 Mich. 1, 53 N. W. (2d) 594. In a case involving wet grain in an elevator, the court in *Hart-Bartlett-Sturtevant Grain Co. v. Aetna Ins. Co.* (1956), 365 Mo. 1134, 293 S. W. (2d) 913, found the facts presented a jury question under the insurance policies of whether an explosion or a flood caused the damage. Flood water had found its way into the bottom of the elevators and had wetted the grain stored therein. The jury found the dislocation of the hopper bottoms of the elevators and the resulting damage to the hopper and the grain were caused by a buildup of pressure from the gases generated by the wet grain or by the gradual expansion of the grain. To the same effect, see *Chicago, R. I. & P. R. Co. v. Aetna Ins. Co.* (1957), 180 Kan. 730, 308 Pac. (2d) 119.

The characteristics and nature of an explosion are well stated in *Tires, Inc. v. Travelers Fire Ins. Co.* (4th Cir. 1958), 253 Fed. (2d) 411, a case involving a water-main rupture which was held not to be an explosion. The court found no error in the instructions to the jury which included the concept of an internal pressure. The court said there "must be pressure for an explosion to take place." It need not be unusual, abnormal, or suddenly produced. Explosion used in "its ordinary sense and related to the common experience of man presupposes that there is first of all a building up of pressure from within or from some internal force, that because of this internal building up of pressure and as a direct result thereof there is an expansion, the pressure can no longer be contained and there is a bursting forth from within caused by an internal force with a possible violent noise and reaction."

On this appeal the insurers argue there existed in the grain no active or kinetic force but only the static force resulting from weight and position. Their experts testified that grain does not compress so as to have any modulus of

elasticity or the desire to regain its shape. The grain under this view could only settle and compress into a hard core which exerted no active force to expand, but merely resisted statically further compression when the steel tank attempted to follow the law of its nature and contract, as the temperature lowered. The experts for the elevator company contended that the wheat did have a modulus of elasticity and because of the compression of the wheat there existed an active force in addition to the force of weight which exerted a counterpressure against the contraction of the tank. Consequently, as we view the evidence and the reasonable inference which might be drawn, a jury question was presented concerning the existence of an active force in the wheat and its relation to the cold-weather-brittle fracture.

This view of the evidence precludes a reversal on the ground there was error in refusing to direct a judgment for the insurers, but because of the prejudicial errors in the instructions they are entitled to a new trial. In view of this disposition of the appeal, it is not necessary to comment on the other questions raised in the briefs excepting the court's failure to give an instruction tendered by the insurers. This instruction provided:

"If you believe that Tank 'A' was destroyed by reason of conditions of temperature, or defects in, or the condition of the tank, itself, or by reason of the brittleness of the steel comprising the side walls of the tank, or by the sheer weight of the wheat within the tank, or by reason of the combination of all or any of such conditions, and if you believe the destruction of the tank was not caused by expansion of its contents, or by an increase in internal force or pressure within the tank, then you are instructed that there was no explosion of Tank 'A.' "

Where there is a conflict in the evidence and inconsistent theories on the cause of the event are advanced, we believe instructions encompassing both theories should be given.

On the evidence as presented, the insurers were entitled to have this instruction given.

*By the Court.*—Judgment reversed, and a new trial granted on the question of liability.

GORDON, J. (*dissenting*). In my opinion, the manner in which the steel storage tank suddenly burst into three separate sections and spewed its contents over the area (as far as 187 feet from the base) to the accompaniment of a loud noise warranted the jury's factual finding that this was an explosion. I would affirm.

I am authorized to state that Mr. Justice FAIRCHILD and Mr. Justice HEFFERNAN join in this dissent.