Amelia BONASTIA, Administratrix of the
Estate of Nick Bonastia, De-
ceased, Respondent,

v.

TERMINAL RAILROAD ASSOCIATION OF
ST. LOUIS, a corporation, Appellant.

No. 51988.

Supreme Court of Missouri,
Division No. 2.

Dec. 12, 1966.

James E. Hullverson, Edward L. Dowd, and Hullverson, Richardson & Hullverson, St. Louis, for plaintiff-respondent.

Schwartz & Ely, Robert C. Ely, St. Louis, for defendant-appellant.

STOCKARD, Commissioner.

Defendant has appealed from a judgment of $50,000 in favor of plaintiff, the widow of Nick Bonastia, in her action brought pursuant to the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. The only issues presented on this appeal are that the trial court erred in refusing a withdrawal instruction requested by defendant, and if not, then that the judgment is excessive.

Mr. Bonastia, an employee of defendant, died on May 29, 1963, after he had on March 29, 1963, sustained an injury in the performance of his duties resulting from the negligence of a fellow employee. Defendant contends that there was insufficient probative evidence to permit a finding that the injury sustained by Mr. Bonastia was a contributing cause of death, and it requested, and the trial court refused, Instruction A as follows: "The issue of the death of Nick Bonastia is withdrawn from the case and you are not to consider such evidence in arriving at your verdict."

While Mr. Bonastia was coupling what is referred to as a bull wagon to another wagon the operator of a tractor to which the bull wagons were coupled drove off without warning, and Mr. Bonastia was injured when caught between a bull wagon and a steel post. In describing the accident a fellow employee said that "as the wagon moved forward it crushed him between the post * * * and crushed him right across

* * * the stomach here and the chest, and then as the wagon passed on by, it kind of rolled him that way and knocked the breath out of him * * *," and the "corner [of the bull wagon] hit him and it just rolled him, the whole side of the wagon."

Following the accident Mr. Bonastia complained that he could not get his breath, he was pale in appearance and held his hands across his chest and stomach. After a few minutes he returned to work. That night he complained to his wife of severe chest pain and he slept poorly. The next morning he said that "it [apparently his chest] was still hurting him bad." After reporting for work he complained of pain in his chest, and about ten o'clock he said that "he couldn't make it any more" and then went to Missouri Pacific Hospital. The description of his injury on the hospital report was "slightly tender, 4th and 5th ribs right, near sternum," and the "preliminary diagnosis" was "contusion of chest." As an outpatient he received two prescriptions for codeine, and X rays were taken of his chest. No fracture of the ribs was shown.

Plaintiff testified that from March 29, the date of her husband's injury, until May 29, the date of his death, he complained about pain "every day," and he said "it was hurting so bad sometimes he couldn't hardly breathe." She said that he also complained that his shoulder would hurt on the left side "like a sharp pain." When plaintiff was asked if there was "any day that he did not make some complaint to you with reference to the chest trouble he was having from the time of the accident until his death," she replied that "he always complained about his chest hurting him so bad." On cross-examination plaintiff stated that in her pre-trial deposition, in reference to her husband's complaints from the time of his injury to the time of his death, she had correctly testified: "Well, sometimes they were getting worse and some days they felt pretty good but most of the time he felt bad."

Plaintiff's husband continued to work until May 20, but he frequently complained to his fellow workers of pain or discomfort in his chest, and once said that "something is wrong inside." One fellow employee testified that every morning he would ask him "how are you doing?" and he would say, "Oh, I hurt," and he made these complaints "pretty regular."

Mr. Bonastia was admitted to the hospital on May 23, 1966. The hospital records showed the "present complaint on admission" to be "Hematuria three days; epigastric pain three days. Loss of appetite, dyspepsia, nausea and vomiting." The "final diagnosis" was "Thrombocytopenic purpura and polycystic kidney." A cardiac examination disclosed "regular rhythm" and "no murmurs." A tenderness "to a small degree over the epigastrium" was noted, and he complained of "some pain in the right upper abdomen." An electrocardiogram was performed on May 24, and again on May 27, and each resulted in readings within "normal limits." He died on May 29. An autopsy was performed and the report contained, among other things, these notations: "Heart: There was an infarct situated near the apex on the left side near the terminal portion of the left descending coronary branch," and "Cause of death: Coronary infarct in the left descending branch; contributing cause, acute pulmonary edema."

Plaintiff called as expert witnesses Dr. Shale Marshall Rifkin and Dr. Fred Mortensen. Neither doctor had treated or examined Nick Bonastia. Each doctor admittedly was qualified as an expert witness. After describing the function of the heart, Dr. Rifkin stated that it is a "muscular structure" which needs blood the same as any other muscle of the body, and that if one of the arterial vessels supplying blood to the heart muscle is occluded or blocked, "the heart muscle that is supplied by that particular branch will undergo death or necrosis, the muscle will die; if the muscle is such a degree the entire heart will die; if it's just a small portion of the heart mus-

cle, it will not undergo death, it will be replaced by fibrous tissue, scar tissue, and the heart will go on with its function," and that the "muscle that dies is * * * said to be infarcted." In explaining what was meant by "a coronary infarct of the left descending branch," he identified on a plastic model of the heart what he called the "left descending coronary artery," and stated that it is a hollow vessel carrying blood to the muscle of the heart, and that "an injury to the wall of the vessel, trauma to the coronary vessel, could form * * * a blood clot," and that would stop the blood going to the heart muscle.

Dr. Rifkin was asked a lengthy hypothetical question in which numerous facts were submitted, including the circumstances of the accident, that from the accident until his death Mr. Bonastia "complained of persistent pain and soreness in his chest, that while at work he had regularly complained of chest pains," and that an autopsy disclosed that "there was an infarct situated near the apex on the left side near the terminal portion of the left descending coronary branch." He was then asked if he had an opinion whether the injury to Mr. Bonastia's chest on March 29, 1963, "either caused or was a substantial contributory cause of his death." No objection was made to the hypothetical question, and there was no contention that any of the hypothesized facts had not previously been established by competent evidence. The doctor's answer was, "It is my opinion that [Mr. Bonastia] sustained an injury to his chest causing an injury to this blood vessel [apparently referring to the left descending coronary artery] which caused an occlusion or blockage of this vessel with subsequent infarction or death of this portion of the muscle near the apex of the heart. The heart was able to function with pain for a period of two months and then failed, the pumping mechanism failed, went into pulmonary edema with fluid in his lungs or the fluid backing up in his lungs and subsequent death."

Dr. Mortensen was asked the same hypothetical question, to which no objection was

made, and his anwer was, "Yes, it [the injury received by Mr. Bonastia on March 29] did cause his death."

Defendant's contention on this appeal is that on cross-examination each doctor related the basis for his opinion, and "in each instance the basis was a false assumption so that the opinions have no probative value," and that the testimony of the treating doctor and the hospital record "showed the cause of death to be a blood disease, which appeared about nine days before death and which was not the result of trauma." Defendant then asserts that the withdrawal instruction, which was refused by the trial court, "was necessary to clearly present to the jury the issue of damages."

Dr. Rifkin admitted on cross-examination that in arriving at his opinion the presence of persistent chest pain was important because pain resulting from injury to the chest wall alone would come and go, but pain resulting from injury to the heart would be persistent. He further stated that if Mr. Bonastia had not suffered persistent chest pain his opinion as to the cause of his death would have been different. The effect of defendant's contention that Dr. Rifkin's opinion was based on a false assumption is that there was no competent and substantial evidence that Mr. Bonastia suffered persistent chest pain. In support of this defendant points out that the pain suffered by Mr. Bonastia was consistent with chest wall pain because (a) Dr. Rifkin testified that although he would not expect chest wall pain to continue for two months it would continue as long as there were bruises, and plaintiff testified the bruises were there until the death of Mr. Bonastia, and (b) Dr. Mortensen testified that complaint of increased pain when lifting or during deep inhalation, of which there was some evidence, indicated chest wall pain rather than cardiac pain. Defendant then asserts that plaintiff testified (to quote from the argument in its brief) that "there were days when her husband felt pretty good."

We are not to weigh the evidence to determine whether Mr. Bonastia suffered persistent chest pain or only pain resulting from injury to his chest wall. Instead, we are to determine whether there was substantial and competent evidence from which it could have been found that he did suffer persistent chest pain. Mrs. Bonastia testified at trial that her husband complained of pain "every day" and that he "always complained" about his chest hurting him. A fellow employee testified that he complained every day that he "hurt." At the hospital he was given two prescriptions for codeine, a medication to relieve pain, and the out-patient hospital reports consistently showed chest pain. This evidence unquestionably would authorize a finding of persistent chest pain, and therefore would support the opinion of an expert witness based upon that assumption. The next question is whether the probative value of the above evidence is destroyed because Mrs. Bonastia testified that on pre-trial deposition she had correctly stated, when asked "about the complaints from the time of his injury * * * until the time of his death," that "Well, sometimes *they* were getting worse and some days *they* felt pretty good but most of the time *he* felt bad."

Defendant asserts that "if there were days when Nick Bonastia felt pretty good" then Dr. Rifkin's opinion of a causal connection was not based upon the actual facts but was instead based upon a false assumption and was not supported by substantial evidence." We do not consider the statement of plaintiff on pre-trial deposition that "some days they [presumably referring to his complaints] felt pretty good" to establish that Mr. Bonastia did not suffer persistent chest pain. At least that is not precisely what was said. Neither do we consider the statement to be inconsistent with plaintiff's testimony at the trial, or with the other evidence from which persistent chest pain could be inferred. But, if we should assume that this vague pre-trial statement, admitted by plaintiff to

have been correct, should be construed to mean that on some days Mr. Bonastia "felt pretty good," that is, did not have persistent chest pain, it was not destructive of the evidence received at the trial which authorized the submission in the hypothetical question of persistent chest pain. In Adelsberger v. Sheehy, 332 Mo. 954, 59 S. W.2d 644, 647, in considering the question of submissibility, it was said that where a party relies on the testimony of a single witness to prove a given issue, and the testimony is contradictory and conflicting, with no explanation of the contradiction and no other fact or circumstance tending to show which version is true, no case is made, and the jury cannot be permitted to speculate. But, it was further held that "if, in such a case, the conflicting and contradictory statements of the witness are reasonably explained, or if there are other facts and circumstances in the case tending to show which story of the witness is true, and from a fair consideration of all the facts and circumstances in evidence a jury could reasonably determine which statement of the witness should be accepted as true, then the credibility of the witness and the weight to be given to his testimony are questions for the jury." In Miller v. Multiplex Faucet Company, Mo., 315 S.W.2d 224, 227, the rule was briefly but concisely stated that "prior statements of a witness, even though the witness is a party, while admissible for impeachment, do not destroy the prima facie probative effect of the contrary testimony of the witness at the subsequent trial." This rule applies to the issue of whether there is substantial competent evidence upon which to base the assumption of a fact in a hypothetical question as well as to the submissibility of an issue.

■■ We cannot say that as a matter of law there was no competent and substantial evidence from which it could be found that Mr. Bonastia suffered persistent chest pain, and that as a matter of law the opinion of Dr. Rifkin was based on a false assumption and for that reason was of no probative value. Proper opinion testimony as to causal connection is competent and constitutes substantial evidence for the submission of that issue to the jury. Dorsey v. Muilenburg, Mo., 345 S.W.2d 134; Schaefer v. Rechter, Mo., 290 S.W.2d 118; Harp v. Illinois Central Railroad Company, Mo., 370 S.W.2d 387, 391. Since we have determined that the opinion testimony of Dr. Rifkin constituted proper opinion testimony of causation and resulted in a submissible issue for the jury, the trial court correctly refused Instruction A requested by defendant, and for that reason we need not expressly rule defendant's contentions as to the opinion testimony of Dr. Mortensen.

Defendant's remaining assignment is that the judgment is excessive. Mr. Bonastia was 53 years of age at the time of his death. At the time of trial, which was more than two years thereafter, his widow was 50 years of age. He had four sons, the older two living in St. Louis, and the younger two being in the Air Force. The youngest son was 18 years of age, but it may be assumed that at the time of Mr. Bonastia's death this boy, then not over 16 years of age, was not in the Air Force and was a dependent. Mr. Bonastia had worked for defendant for 15 to 20 years as a baggage handler. His income in 1961 was $5,321 and in 1962 it was $6,717. The jury verdict was for $60,000 but was reduced to $50,000 by the trial court on conditional remittitur.

■■ The burden of establishing that the judgment is excessive is on the defendant. It cites and relies upon only one case, Hughes v. Terminal Railroad Ass'n of St. Louis, Mo., 296 S.W.2d 59, decided in 1956, in which a judgment for $55,000 was reduced by conditional remittitur to $40,000. The factual situations in that case and this one are somewhat similar. When we take into consideration the various permissible factors pertaining to our authority to order a remittitur, including changing economic conditions, Hunter v. St. Louis Southwestern Railway Company, Mo., 315 S.W. 2d 689, 697, and that the trial court after

thoughtful consideration ordered a remittitur of $10,000, Greenan v. Emerson Electric Mfg. Co., 354 Mo. 781, 191 S.W.2d 646, we necessarily conclude that the only authority cited and relied upon by defendant to meet its burden of establishing excessiveness neither justifies nor requires an additional remittitur in this case.

The judgment is affirmed.

BARRETT and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All of the Judges concur.