Nathan L. **COULTER**,
Plaintiff-Respondent,

v.

**MICHELIN TIRE CORPORATION,**
Defendant-Appellant.

No. 11336.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 6, 1981.

Application to Transfer Denied
Nov. 10, 1981.

Flavius B. Freeman, Neale, Newman, Bradshaw & Freeman, Springfield, John M. Kenney, New Hyde Park, N.Y., for defendant-appellant.

Benjamin J. Francka, Raymond E. Whiteaker, John E. Price, Woolsey, Fisher, Whiteaker, McDonald & Ansley, Springfield, for plaintiff-respondent.

HOGAN, Judge.

In this action based on strict liability in tort, plaintiff Nathan Coulter has had a verdict and judgment in the amount of $140,000 against defendant Michelin Tire Corporation. Defendant appeals.

The casualty sued upon occurred July 22, 1970. Plaintiff was employed as a tire mounter by a corporation known as "Tire Town of Springfield." Shortly before noon, plaintiff and two other tire changers were mounting a new set of Michelin tires on a Lincoln Continental automobile. Plaintiff removed a tire and rim from the vehicle and placed it on a tire changer. He removed the tire which was on the rim and undertook to mount the new tire. While the plaintiff was attempting to seat the "bead" of the new tire against the rim, the tire exploded. Plaintiff sustained severe, disabling injuries. This action followed.

On this appeal, the defendant has briefed and argued five assignments of error. Defendant's principal point is that plaintiff made no submissible case. In connection with this point, a few preliminary observations are appropriate. The cause was tried and submitted upon the theory enunciated by our Supreme Court in *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362, 364 (Mo.1969). Therein, the court "... recognized the concept of strict liability in tort as stated in 2 Restatement, Law of Torts, Second, § 402A." *Blevins v. Cushman Motors*, 551 S.W.2d 602, 606[1] (Mo.banc 1977). In order to recover under the doctrine of strict liability, a plaintiff must establish that: (1) the product was defective and dangerous when put to a use reasonably anticipated by the manufacturer; and (2) the plaintiff sustained injury or damage as a direct result of the defect. *Blevins v. Cushman Motors, supra*, 551 S.W.2d at 607[2, 3]; *Rogers v. Toro Manufacturing Company*, 522 S.W.2d 632, 637[4–6] (Mo.App.1975). And, in order to establish the first element of his case, a plaintiff has the burden to show both (a) that the defect existed when the product left the manufacturer's control and entered the stream of commerce, *Brissette v. Milner Chevrolet Company*, 479 S.W.2d 176, 181 (Mo.App.1972),[1] and (b) that the product was being put to a use reasonably anticipated by the manufacturer. *Keener v. Dayton Electric Manufacturing Company, supra*, 445 S.W.2d 365[6]; *Rogers v. Toro Manufacturing Company, supra*, 522 S.W.2d at 637; Restatement (Second) of Torts § 402A, Comment h. (1965).

Fairly paraphrased, defendant's submissibility argument is that plaintiff failed to show the existence of any defect which would make the tire unreasonably dangerous when put to a reasonably antici-

---

1. We equate this requirement with proof of "... a defect that was likely present when the maker surrendered possession and control." See W. Keeton, Products Liability, 50 F.R.D. 338, 341 (1970).

pated use because: (1) there was no substantial evidence that there was any defect present when the maker surrendered possession; (2) the testimony of plaintiff's expert that the tire had a "kinked" bead wire is without probative value, and (3) the evidence establishes as a matter of law that plaintiff's injuries were caused by abnormal use of the tire. We set to one side the defendant's contention that its motion for judgment n.o.v. should have been sustained because plaintiff failed to adduce proof of the very defect pleaded. This case is very similar to *Nielson v. Armstrong Rubber Co.*, 570 F.2d 272 (8th Cir. 1978), upon the relevant law and facts, and the issue submitted must be regarded as having been tried by implied consent pursuant to Rule 55.33(b), Missouri Rules of Court (9th ed. 1978). See *Nielson v. Armstrong Rubber Co., supra*, 570 F.2d at 275[1, 2]. We also bear in mind that when the submissibility of a plaintiff's cause is challenged on appeal, the plaintiff is entitled to the benefit of all the evidence construed in the light most favorable to the result reached, together with the reasonable inferences to be drawn therefrom. *Tucker v. Central Hardware Company*, 463 S.W.2d 537, 540 (Mo.1971); *Winters v. Sears, Roebuck and Co.*, 554 S.W.2d 565, 569–570[6] (Mo.App.1977), 89 A.L.R.3d 196, 202 (1977); *Lifritz v. Sears, Roebuck and Company*, 472 S.W.2d 28, 31[2] (Mo.App.1971).

Defendant's assertion that the plaintiff adduced no substantial evidence of any manufacturing defect is obliquely put in terms of the admissibility of evidence, but its position is clear. As put, the argument is that the testimony of plaintiff's expert should not have been received because the expert did not examine the tire until October 1977, and there was no showing that the tire was in the same condition then as it was on July 22, 1970.

■ We conclude the proof was sufficient to show the existence of a defect on

July 22, 1970. To begin with, the record justifies the inference that the tire was new and unused when the plaintiff attempted to mount it and was injured. Witness Pierson testified that the tires he and plaintiff were mounting were taken out of stock, "wrapped in some wrappings." Pierson explained that "you take a knife and go between the two beads and cut the paper . . . and you clean the inside of the tire out." The "paper" or "trash" was then cleaned out of the tire, some "little plastic things" which separated the "beads" were removed, and the tire was mounted. One Boswell, plaintiff's "straw boss" at the time, testified that he examined the tire after plaintiff was injured. Being asked if the tire appeared to be in the same condition as it had been at the time of plaintiff's injury, Boswell replied, "It looks the way I remember it, yes."

By answer to interrogatories, defendant admitted it received the tire for inspection on August 20, 1970, and defendant's expert Ochs testified that photographs of the tire were taken about that time. Ochs had seen those photographs. The answers to interrogatories show the defendant returned the tire to plaintiff's employer in January 1971. Defendant was again in possession of the tire from November 1972 to April 25, 1973, when it was again returned to the plaintiff's employer, Tire Town of Springfield. This action, we note, was commenced in August 1974, although it was not tried until November 1978.

Ochs appeared at the trial. He was employed as "director of product analysis" for the Michelin Tire Corporation. He testified that he had seen the photographs taken in 1970, and based on his examination of those photographs and his examination of the tire in 1977, the tire appeared to be in the same condition "in terms of physical damages" as it was when it was first received by the defendant in August of 1970.[2] Mr. Ochs

---

**2.** The witness' response seems to have been qualified because there were yellow chalk marks on the tire. It was shown that the yellow chalk marks had been made by plaintiff's expert, Mr. Garvick.

was asked about some raised striations (we count 12) which appear at intervals of about 6½ inches around the circumference of the tire. Counsel referred to "those little marks." Mr. Ochs explained that the raised striations are called "mold flesh" and represent "excess" which oozes out during the manufacturing process. Ochs was also asked, "Can you tell whether or not this tire has ever been mounted before and run on the highway?" He answered, "I'd say from the condition of the tread face it has not been run."

When plaintiff's expert Garvick first saw the tire in 1977, it was still in possession of plaintiff's employer. Mr. Garvick testified that after he took possession of the tire, he measured the tread depth, and from this measurement he determined that the tire was a new tire which had never been in road service. This witness also observed the "vent lines (striations) from the segment[s] of the mold. . . ." He continued: "If the tire had been in service, of course, those would be worn, so I knew that the tire had not been in service but something happened to it before it got into service." Garvick also unequivocally stated that the "kinked beads" (the defect alleged to have caused plaintiff's injuries) had been produced at the time of manufacture. This witness also testified that he found no "external damage" to the tire.

Perhaps the best evidence that the tire is in the "same condition" as it was at the time of the accident is the tire itself. As the tire appears before us, raised striations produced in the manufacturing process are clearly visible; it is obvious that the tire has not been used.

■ The rule is that the existence of a manufacturing defect may be proved by any species of evidence, direct or circumstantial, from which a jury may infer the existence of such defect without resort to conjecture and speculation. *Weatherford v. H.K. Porter, Inc.*, 560 S.W.2d 31, 33–34[2, 3]

(Mo.App.1977); *Winters v. Sears, Roebuck and Co., supra*, 554 S.W.2d at 569[5], 89 A.L.R.3d at 202; *Brissette v. Milner Chevrolet Company, supra*, 479 at 181–182[5]. The testimony of an expert may constitute substantial evidence of a manufacturing defect in a tire, even though the tire has been used or partially destroyed. *Smith v. Uniroyal, Inc.*, 420 F.2d 438, 441–442[4] (7th Cir. 1970); *Brissette v. Milner Chevrolet Company, supra*, 479 S.W.2d at 181–182; *Firestone Tire & Rubber Co. v. King*, 145 Ga. App. 840, 244 S.E.2d 905, 908–910[1–4] (1978); *Mullen v. General Motors Corporation*, 32 Ill.App.3d 122, 336 N.E.2d 338, 344[4–6] (1975). In this case, the jury could reasonably infer: (1) that the tire was a new, unused tire when it exploded and injured the plaintiff; (2) that the tire had been repeatedly examined during the long period which elapsed between the accident and the trial; two experts who examined it found no signs of use or external damage to the tire sufficient to cause the "bead wire" to break; (3) that in the opinion of Mr. Garvick, plaintiff's expert, the defect had been produced when the tire was manufactured, and (4) that at the time of trial the tire appeared to be a new tire except for the damage caused by the explosion. There was, therefore, substantial evidence that the tire was defective at the time it was sold.

Defendant further argues that the testimony of plaintiff's expert was without probative value because his opinion was not based on "fact, evidence, adequate data, or experience."

As is usually the case in products liability litigation, the evidence of defect is rather technical. The testimony can be understood if it is taken in connection with the exhibits, but of course the exhibits cannot be incorporated in this opinion. We have therefore prepared a very rough diagram of the tire which may be helpful if one conceives a tire as a series of concentric circles.

10:30 break — serial no.

— tread and tread base

6:00 break — bead wire, covered with rubber

— striations

The tire itself is described as a Michelin tubeless 225–15 X. The serial number on the tire is F2613 01Y, and the experts present at the trial testified with this number "straight up" or "in the 12:00 o'clock position." We have made a few measurements with a flexible rule to indicate the approximate dimensions of the various parts of the tire. We measure the tread and tread base to be about 2 inches; the carcass measures about 4 inches and the "bead," which incorporates the "bead wire," measures about 2 inches. The "bead" is that part of the tire which seats against the rim of the wheel and holds it firmly in place. "Mounting" the tire involves preliminary lubrication of the tire and rim, then: (1) pushing the bottom bead into the "well" of the rim; (2) fitting the top bead of the tire onto the rim with a rotating metal "finger" which is part of the mounting device; (3) centering the tire, making sure a "hold down" device secures the wheel; and (4) inflating the tire slowly until the "bottom" and the "top" beads seat. The recommended pressure for seating the beads is 40 p.s.i.[3]

The defect or defects which plaintiff's evidence tended to prove were "kinks" in the bead wire. Defendant's Exhibit "F" is a sample of the bead wire used by defendant in the manufacture of the tire in question. It appears to be a bundle of wires, but is in fact one larger wire with a continuous 9–wire outer wrap. Lengths of this wire are bent into a hoop which is spot welded. This wire, or bundle of wires, is then incorporated into the bead. Plaintiff's expert testified that the word "kink" as used in rubber technology actually refers to a "slight bend" in the bead wire, causing

the bead to be "out of round." One of defendant's experts, Mr. Dunlop, testified that the word "kink" is a "very minor bend" involving "about a ten degree distortion from being straight."

Plaintiff's theory upon trial was that the tire exploded because the bead wire was "kinked." To prove this, plaintiff called one Kenneth R. Garvick. Mr. Garvick was retired, but did "consulting work" for his former employer. Mr. Garvick's experience was as follows: In 1936, he graduated from Case School of Technology with a B.S. degree in chemical engineering. He "went directly to [work for] Firestone." For 17 years Mr. Garvick worked for Firestone; for 8 of those years, he was "involved in testing [and] quality control." While he was employed at Firestone, he continued his professional education. In 1953, Mr. Garvick was employed by the Mansfield Tire and Rubber Company; he became director of the tire engineering division of that company. As director of tire engineering, his responsibilities included development of the specifications for each tire that Mansfield made. From 1962 to 1977, Mr. Garvick had "handled the product liability claims that [had] come to trial." His experience included Michelin tires as well as other tires; he had measured and cut up other manufacturer's tires to "know what the industry [was] doing." Mr. Garvick subscribed to "industry [technical] service[s]."

Mr. Garvick first saw the tire at Tire Town. The tire is, by the way, a white sidewall tire, but the breaks are on the "black" or blackwall side. He observed breaks at the "6:00 o'clock position" and "the 10:30 position" and decided it would be

---

**3.** "P.s.i." means pounds of air pressure per square inch.

a good idea to x-ray the tire because the center strand of the bead wire showed a "cup and cone" appearance at the site of both breaks. The "cup and cone" appearance indicated a "tension break." The cup and cone appearance is not readily visible to our eye, but photographs of the x-rays. particularly the photograph received as "Garvick Deposition Exhibit 7," clearly show that the broken center strand appears to be "cupped" on one side and "coned" on the other.

Mr. Garvick's opinion as to the cause of the breaks was given as follows:

> " * * *
>
> My opinion on this—the breaks ... are the result of kinks at those two locations at the time of manufacture, and this caused the bead to not be a complete circle, ... [so] the bead hung up in those two locations and ... the pressure stretched the beads beyond the wires' elastic limits in those two areas, and as a result, [the tire] broke ... on the black side wall side at what I call the [6:00] and [10:30] positions. . . ."

Mr. Garvick was asked how such defects could occur during manufacture of a tire. Michelin's insistence that its method of removing cured tires from the mold is failsafe and *could not* have produced a kinked bead makes it important to note the language of his answer:

> "Well, the most commonplace [stage] would be [when] it's forced off the bead seating rings at the end of the curing cycle, *but it could be done other places.* That would be when you had a power failure where it's a mechanical failure that would interfere with its being removed and would twist the bead. (Our emphasis.)
>
> * * * "

This witness was questioned by defendant about his knowledge of Michelin tires. Mr. Garvick did not know how a Michelin tire was lifted from the mold in which it is made because he had never been in a Michelin plant. He did testify—on direct examination—that he was familiar with the segmented mold processes used by other tire manufacturers, but explained that "the bead part is solid on both sides, and ... is stationary [while the tire is being cured]." On cross-examination, Mr. Garvick repeated that the segmented mold process did not affect the bead.

Defendant vigorously argues that Mr. Garvick's opinion was not substantial evidence that the tire contained a manufacturing defect because his opinion was without support in fact, evidence, adequate data or experience. Defendant cites *Craddock v. Greenberg Mercantile*, 297 S.W.2d 541 (Mo. 1957) and *Gaddy v. Skelly Oil Co.*, 364 Mo. 143, 259 S.W.2d 844 (1953). The precedents cited undoubtedly have some relevance here, but they are not controlling. Here, the plaintiff's case does not rest wholly upon his expert's testimony, as was the case in *Craddock* and *Gaddy*. Unlike the cases cited by the defendant, Mr. Garvick's testimony was not based on wholly suppositious physical facts nor upon conditions assumed to exist.

Defendant's argument that Garvick's testimony cannot be accepted as substantial evidence is very diffuse. As we perceive it, defendant's point, as expanded in its brief, is that: (1) Garvick's opinion was not based on any facts known to him; (2) Garvick's experience was not sufficient to qualify him to testify about Michelin Tires; and (3) the fact that the "kinks" were destroyed by the explosion deprives his testimony of all probative value.

■ The first contention may be addressed shortly. Garvick examined a tire which was inferably a new tire; he made measurements and inspected the damaged area of the tire with a magnifying glass. Thereafter x-ray pictures of the broken bead were made under his supervision. He found a "cup and cone" appearance to the bead wire. He had first-hand knowledge about the tire and knew the tire had exploded. His inspection was sufficient to provide the basis for an opinion. *Tucker v. Central Hardware Company, supra*, 463 S.W.2d at 539–541; cf. *Lewis v. United*

*States Rubber Company,* 414 Pa. 626, 202 A.2d 20, 22 (1964).[4]

■ The assertion that Garvick's expertise did not extend to Michelin tires is overstated. When the existence of a manufacturing defect in a tire has been put in issue, the courts have generally looked to the extent of the proffered expert's experience, rather than his familiarity with a particular product. See, e. g., *Smith v. Uniroyal, Inc., supra,* 420 F.2d at 441–442[4]; *Edwards-Warren Tire Co. v. J.J. Blazer Const. Co.,* 565 F.2d 401, 404[3] (6th Cir. 1977). Complete knowledge about the field is not necessary. 3 J. Weinstein and M. Berger, Weinstein's Evidence, § 702[04], pp. 702–28 —702–29 (1978). The assumption usually made by courts in assessing a proffered expert's knowledge of the details of a particular technology is " . . . that if the asserted expert emerges from a respectable professional environment, errors in the detail of factual information honestly assembled and imparted by capable preceptors and associates will tend to check against one another and produce a reliable aggregate." [5] That assumption was and is justified in Mr. Garvick's case.

■ The final aspect of this point deals with the condition of the tire at the time it was x-rayed. Mr. Garvick testified that the kinks in the bead were destroyed in the explosion, and were not visible in his photographs of the x-rays. Defendant would have it that because the kinks were destroyed, their existence could not reasonably be inferred.

This argument is neither novel nor convincing. In *Smith v. Uniroyal, Inc., supra,* the state police officer who investigated the accident testified there was a hole in the tread, part of which was missing. Inferably, a part of the bead flange was missing. One George Guernsey inspected the tire after the accident; thereafter it was de-stroyed or lost. Mr. Guernsey was nevertheless permitted to testify to the existence of a defect in the part of the tire which had been destroyed and the action of the district court was upheld on appeal. A similar contention was presented to the Georgia Court of Appeals in *Firestone Tire & Rubber Co. v. King, supra,* 145 Ga.App. 840, 244 S.E.2d at 909. The appellant manufacturer contended, among other things, that the precise nature of the manufacturing defect had not been established. The court held that the existence of a manufacturing defect could be inferred from circumstances, and continued, 244 S.E.2d at 909:

> "Furthermore, the defect in this case could not be directly observed [because] the material in the area of the blowout was destroyed by the blowout. To rule that this prevented [the plaintiff] from establishing a prima facie case would be to insulate manufacturers from liability . . . in any case where the defect causes its own destruction. Such a result would be totally untenable."

In this particular case, we agree with the Georgia court and find the defendant's argument untenable.

■ The third part of defendant's submissibility point is that the casualty and plaintiff's injuries were the result of his careless handling of the tire. The substance of this argument is that even though the tire was being used for an appropriate purpose—mounting on the rim of a wheel—plaintiff's failure to follow customary practices constituted misuse barring recovery. We realize that the law on this point is in a state of evolution—"flux" [6]—but for the purpose of our analysis, we shall follow the view recognized by our Supreme Court, Dean Prosser and the Restatement. Careless handling is a species of abnormal use which bars recovery under the doctrine of

---

**4.** See also W. Keeton, *supra,* n. 1, 50 F.R.D. at 342, discussing evidence of defects.

**5.** 3 J. Weinstein and M. Berger, *supra,* n. 20, at p. 702–14, citing Maguire and Habesy, "Requisite Proof of Basis for Expert Opinion", 5 Vand. L.Rev. 432, 433, 438 (1952).

**6.** W. Keeton, Products Liability and Defenses—Intervening Misconduct, 15 The Forum 109, 111–116 (1979); D. Noel, Defective Products: Abnormal Use, Contributory Negligence, and Assumption of Risk, 25 Vand.L.Rev. 93, 100–103 (1972).

strict liability. *Keener v. Dayton Electric Manufacturing Company, supra,* 445 S.W.2d at 365[6]; W. Prosser, Torts § 102 at 669 (1971); Restatement (Second) of Torts § 402A, Comment j. (1965).

 Ordinarily, in "defect cases," as distinguished from "design cases," the issue of abnormal use is a question for the jury.[7] We regard it as a factual issue in this case.

Defendant's position may be summarized by saying that it contends plaintiff: (1) failed to apply lubricant when mounting the tire; (2) inflated the tire with an excessive amount of pressure; and (3) failed to secure the tire to the tire mounting device before he started inflating it.

Plaintiff was an experienced tire changer. At the time the casualty occurred, plaintiff had been employed as a tire changer for a little more than 6 months. He estimated that before the accident, he had mounted about 15 Michelin tires "a day." Assuming plaintiff worked a normal 40–hour week, he had mounted about 1800 Michelin tires by July 22, 1970, when he was injured. Plaintiff described his procedure at the time of his injury by testifying that he first removed the rim with the "old tire" on it and "put the tire on the changer." The "changer" or mounting device is a flat circular metal plate mounted on a pedestal; the pedestal is attached to a circular metal base which has been screwed into a concrete floor. There is a threaded metal post in the center of the mounting platform. The threads accommodate a "lock nut" which secures the rim on the changer while the tire is being mounted.

Plaintiff "broke down" the old tire and Mr. Hamm handed him the "new tire" to be mounted. He then "soaped both beads, . . . soaped the rim" and started to mount the tire. He stretched both beads over the rim flange. Plaintiff's testimony was that when "you put [the tire] on [the mounting platform] and screw . . . [the] lock nut

down, [the tire] automatically centers." He added that "sometimes they have devices that you set on there like cylinders that you put around the rim and it holds the bead up to the cylinder . . . ." There was such a cylinder here, and plaintiff used it.[8]

Plaintiff then began inflating the tire, without a valve core in the valve. He did not use a core [stem] because "you've got to air it all the way up to forty pounds so it'll seat, and then you let the air out so it will relax, and then you put the valve core in when you air it back up to the maximum pressure." Plaintiff admitted that sometimes he seated the beads by using more than 40 p. s. i., but on this particular occasion, plaintiff "counted" "one thousand, two thousand, three thousand, four thousand, five thousand, and that's about forty pounds of air." Plaintiff knew this because he had mounted tires "many, many times before and it always worked out that way." Plaintiff amplified this answer by saying he meant when he had checked the air pressure with a gauge, his "five thousand count" had produced about 40 "pounds" of air.

At this point, the plaintiff was preparing to "[l]et the air hose off and let the air pressure back out [of the tire]" because the "top" (whitewall) bead had not seated. However, at the count of "five thousand," the tire exploded.

Upon trial, there was a good deal of controversy about the "lock nut." Mr. Coulter's testimony was that he had screwed the lock nut against the rim when he "centered" the tire on the mounting device. Thereafter, he loosened the lock nut slightly so the rim would not be "in a bind" when the tire was inflated to seat the bead.

 There was evidence from which a jury could infer that if the plaintiff undertook to mount the tire in the manner to which he testified, he was following proce-

---

**7.** See D. Noel, *supra,* n. 6, 25 Vand.L.Rev. at 104–105.

**8.** It is clear, in context, that plaintiff was referring to the "Omega Bead Expander." Defend-

ant's Exhibit "A", entitled "Michelin Mounting Procedure," directs the tire mounter to use this device "for difficult inflation."

dures ordinarily followed in the industry. It is true that the defendant adduced proof tending to indicate the plaintiff did not lubricate the tire before he attempted to mount it. Further, there is evidence from which it could readily be found that Mr. Coulter did not use the lock nut and that he overinflated the tire. This evidence might be restated in detail, but an extensive recountal of defendant's evidence would only demonstrate that a jury could reasonably have reached a different conclusion. It must be remembered that in jury-tried cases, an appellate court does not weigh the evidence; it merely determines whether there was competent and substantial evidence to support the jury's finding. *Diversified Metals Corp. v. Aaron Ferer & Sons, Inc.*, 498 S.W.2d 783, 785[2] (Mo.1973); *Bonastia v. Terminal Railroad Ass'n of St. Louis*, 409 S.W.2d 122, 125[1] (Mo.1966); *Pfingsten v. Franklin Life Insurance Company*, 330 S.W.2d 806, 816[11] (Mo.1959). The jury was the sole judge of the credibility of the witnesses and the weight and value to be given their testimony and could believe or disbelieve any part of that testimony. *Thayer v. Sommer*, 356 S.W.2d 72, 77[6] (Mo.1962). It is true, as the defendant asserts, submissibility is ultimately a matter of fact for the court. *Craddock v. Greenberg Mercantile, supra*, 297 S.W.2d at 548. It is also true that much of the evidence is circumstantial and that some of the inferences must be drawn by choosing between the conflicting opinions of experts. Nevertheless the jury had the function and the right to find some of the facts, even some facts essential to the plaintiff's case, by reasoning upon the evidence, including circumstantial evidence, and inferring from such evidence that a certain required thing or fact existed or was true. *Hart-Bartlett-Sturtevant Grain Co. v. Aetna Ins. Co.*, 365 Mo. 1134, 1149–1150, 293 S.W.2d 913, 923–924 (1956), cert. denied 352 U.S. 1016, 77 S.Ct. 562, 1 L.Ed.2d 548 (1957); *Hardwick v. Kansas City Gas Co.*, 355 Mo. 100, 107, 195 S.W.2d 504, 508[4], 166 A.L.R. 556, 561 (1946). We cannot say as a matter of law that it was error to submit that the tire was being used in a manner reasonably anticipated by the manufacturer when it exploded.

Defendant has briefed and argued two points alleging error in the exclusion of evidence. The first point, as stated, is that the trial court erroneously excluded evidence of the involvement of the Sentry Insurance Company in this cause. Defendant argues that "such evidence" was necessary to properly evaluate the deposition testimony of Mr. Robert Dunlop and to account for Mr. Dunlop's absence from the courtroom. In support of its point, defendant cites *Houfburg v. Kansas City Stock Yards Co. of Maine*, 283 S.W.2d 539, 548–549 (Mo.1955); *Leavitt v. St. Louis Public Service Company*, 340 S.W.2d 131, 138[9] (Mo.App.1960), and other cases which hold that the interest or bias of a witness and his relations to or feelings toward the parties or the case are never irrelevant matters, and that the pecuniary interest of a witness, or his bias or prejudice may always be shown, subject to such limitations as may be imposed by the trial court. Plaintiff counters with the argument that evidence of the involvement or interest of a workmen's compensation carrier was not admissible because such evidence tends to impede the injured man in the exercise of his right to receive full compensation. Plaintiff cites *Pritt v. Terminal R. R. Ass'n of St. Louis*, 251 S.W.2d 622, 625 (Mo.1952).

■ It is a reasonable inference from the record that plaintiff's employer's workmen's compensation carrier joined in this action as a subrogee. Nevertheless, the principle invoked by the defendant does not apply in this case. It is, and has been for many years, the rule in Missouri that a party may not directly impeach the credibility of his own witness. *Wells v. Goforth*, 443 S.W.2d 155, 159[6] (Mo.banc 1969). The rule has been relaxed as to witnesses who are adverse parties, *Wells, supra*, 443 S.W.2d at 159–160, but the witness defendant sought to impeach was not an adverse party.

Defendant had the benefit of testimony from three experts in tire technology. Mr. Ochs, who was called by the plaintiff, testified on cross-examination that the tire

failed because of mismounting and overinflation. Mr. Avila, an independent expert called by the defendant, testified that he had examined the tire carefully and had the opinion that the tire had no manufacturing defect. Mr. Avila concluded that the tire failed because it had not been lubricated and had been overinflated.

Mr. Dunlop's deposition was taken in Florida on March 31, 1978. His credentials as an expert in tire technology are not questioned, but certainly the defendant was not obliged to rely on Mr. Dunlop as the only witness by which it could prove some element essential to its defense. Nor can it be said that the defendant was surprised; it had known of the contents of Mr. Dunlop's deposition for some time prior to trial. Nevertheless, defendant offered Mr. Dunlop's deposition and insisted it was entitled to show he had been employed by the workmen's compensation carrier for the plaintiff's employer. Upon plaintiff's objection, the trial court excluded parts of the deposition and some correspondence indicating that Mr. Dunlop had indeed been employed by the carrier. Otherwise, the deposition was admitted and read in evidence; Mr. Dunlop's testimony was very favorable to the defendant.

 The rule in Missouri is that the introduction of a deposition or a part thereof for any purpose other than that of contradicting or impeaching the deponent makes the deponent the witness of the party, unless the deponent is the adverse party. *Conner v. Neiswender*, 360 Mo. 1074, 1081, 232 S.W.2d 469, 473 (1950). In the case at hand, the defendant manifestly sought the benefit of Mr. Dunlop's testimony; the thrust of its argument here is that Mr. Dunlop was the most experienced and competent expert who testified. Defendant, in effect, sought to have the benefit of Mr. Dunlop's testimony and increase the value of that testimony by showing his bias in favor of the plaintiff or his insurer. The trial court did not err in refusing to permit defendant to discredit its own witness. *Conner v. Neiswender, supra*, 360 Mo. at 1082, 232 S.W.2d at 474; *Dunn v. Dunnak-*

er, 87 Mo. 597, 600–601 (1885); *Woelfle v. Connecticut Mut. Life Ins. Co.*, 234 Mo.App. 135, 148–149, 112 S.W.2d 865, 872[7] (1938).

A further point advanced by the defendant is that the trial court erroneously refused to permit defendant to read parts of the plaintiff's deposition in evidence as part of the defendant's case because the parts of the deposition offered constituted substantive admissions on plaintiff's part.

The plaintiff's deposition was taken in September 1975; defendant's counsel used that deposition to impeach the plaintiff on cross-examination. Upon deposition, plaintiff testified that he had "no idea" what the air pressure in the tire was just before it blew up; that the tire "wouldn't go up right and when I aired it up, there it went, it blowed up." At the time the deposition was taken, plaintiff said he didn't remember if he used any lubricants in mounting tires on the day of the accident, and had "no idea" how far he had screwed the lock nut down on the mounting device before he began to inflate the tire. These and other inconsistent statements were put before the jury during defendant's cross-examination.

Defendant's point, slightly paraphrased, is that it should have been permitted to offer these inconsistent statements *again* as part of its case because the inconsistent statements of a party-opponent constitute substantive evidence.

 There can be no doubt that a party's prior inconsistent statements, by deposition or otherwise, are admissible against him as substantive evidence in the nature of an admission. It is also true that such inconsistent statements are also admissible for the more limited purpose of impeachment. *Welch v. Hyatt*, 578 S.W.2d 905, 913[4] (Mo.banc 1979); *Pulitzer v. Chapman*, 337 Mo. 298, 318[3], 85 S.W.2d 400, 410–411[5–7] (banc 1935); *White v. Burkeybile*, 386 S.W.2d 418, 422–423[3] (Mo. 1965). And, our courts have defined the term "admission" very generously; the testimony received as such need not be a direct admission of an ultimate fact in issue; it may be competent if it bears on the issue incidentally or circumstantially. *White v.*

*Burkeybile, supra,* 386 S.W.2d at 422. So, we suppose, the fact that plaintiff "had no idea" or "did not remember" one or another evidentiary detail of his case on one occasion might conceivably have some probative value as an admission on another occasion when he could remember or had refreshed his memory. Even so, the trial court's ruling was not prejudicial. If, in a specific instance, a trial court excludes evidence which should have been admitted, the error is harmless if the same evidence is found in the testimony of the same or other witnesses given before or after the objection was sustained. *Boring v. Kansas City Life Insurance Company,* 274 S.W.2d 233, 238–239[7] (Mo.1955); *Steffen v. Southwestern Bell Telephone Co.,* 331 Mo. 574, 583, 56 S.W.2d 47, 48[1–3] (1932); *Hastey v. Kaime,* 317 Mo. 1010, 1017, 297 S.W. 50, 52[3] (1927); *Moore v. St. Louis & S. F. Ry. Co.,* 267 S.W. 945, 949[9] (Mo.App.1925). The point is without merit.

The final substantive point made by defendant is that the verdict is excessive, the trial court ignored its request for a remittitur, and a new trial should be granted. Here again, proper consideration of the argument requires some preliminary explication.

The explosion of the tire resulted in permanent injury to plaintiff's left forearm and to the left side of his skull. The injury to his left forearm is his disabling injury. Relying upon the record and that common fund of knowledge all educated men are presumed to have, we infer that there are two bones in the forearm—that part of the arm between the elbow and the wrist. If one extends his forearm prone (palm down) upon a flat surface, the bone which runs along the outside of the arm from the elbow to the wrist is called the *ulna;* the bone along the inside of the arm is called the *radius.* These two bones are articulated, i. e., jointed at the elbow and at the wrist. The articulations of the bones of the forearm permit a rotating movement of the hand described as pronation (hand palm down) and supination (rotation outward so the palm is up). The jointure of the ulna at the elbow permits flexion and extension of the forearm. Permanent damage to the ulna impedes both rotation of the hand in the manner described and flexion and extension of the forearm. In this connection, it should be noted that the plaintiff is left-oriented, or as the parties have put it, left-handed.

Plaintiff was admitted to the intensive care unit of a Springfield hospital about noon on July 22, 1970. He was unconscious. Examination disclosed an open, comminuted fracture [9] of the left ulna a short distance below the elbow, dislocation of the radius at its articulation with the ulna and a fracture of the left zygoma, or cheekbone.

Plaintiff had suffered a concussion; he was examined by a neurosurgeon and was then taken to an operating room. A general anesthetic was administered. An orthopedic surgeon cleaned out the wound to plaintiff's left arm and, using a knife and scissors, removed all foreign material. The wound was enlarged slightly; the orthopedic surgeon then drilled a hole in the olecranon [10] and undertook to reduce and fixate the fracture by screwing a 6-inch bone screw into the broken bone, pushing the fracture fragments into place as the screw was advanced. At the last turn of the screw, "a snap was felt." The radius was then placed in its normal position, and a "long laceration of the forehead and lateral face" was repaired, together with several smaller lacerations about the face and mouth. A long cast was applied to plaintiff's left arm.

Six days later, plaintiff underwent another surgical procedure to repair his facial fracture. Plaintiff's left cheekbone was found to have been broken into fragments. The fragments were wired together and the bone was "formed." The wounds to plaintiff's face were closed and a sterile bandage was applied. On August 3, 1970, the plaintiff was discharged from the hospital "to be followed on an outpatient basis."

---

9. The term means denotes a break into several pieces.

10. The process of the ulna which projects behind the elbow.

Neither operation produced a satisfactory result. The plaintiff's orthopedic surgeon "followed [plaintiff] on a serial basis in [the surgeon's] office," but it became apparent the ulnar fracture was not healing. The physician suggested that reoperation might provide the plaintiff with a "better forearm." On December 10, 1970, plaintiff was again admitted to the hospital. Plaintiff's orthopedic surgeon then performed what is called a "sliding bone graft." The nature of this operation was graphically described by another orthopedic surgeon who examined the plaintiff on behalf of the defendant. This physician explained that plaintiff's left arm fracture had distinctive characteristics and was often called "Monteggia's fracture." He continued:

"... [T]he head of the radius is displaced and all of the force goes on the upper part of the ulna, the large bone which is broken. This usually occurs about three inches below the elbow joint. And in such a fracture, the blood supply is somewhat interfered with. And instead of a good callous bone formation, scar tissue develops at the fracture site so the bone doesn't heal solidly, and it is called a non-union.

Now when this condition occurs, the fracture site has to be exposed by surgical operation and scar tissue about the old fracture removed. The bone is freshened and then ... the incision is extended down to expose [the] bone, and then a bone graft which is—it's really a slot of bone cut by a double saw—and then this new bone is slipped across the fracture site ... and it's usually maintained by some type of fixation. In [plaintiff's] case, three metal screws were used."

Counsel asked the witness to explain the use of the saw. The witness replied:

"Usually, why, we have a two-bladed saw. That is run across along the shaft of the bone. Usually, a two-bladed saw is used because it gives a graft a proper proportion where it will fit snugly in the slot in which it is being placed."

The interrogation then proceeded:

"Q. So you actually take that saw and slice off a piece of the ulna bone itself? A. Yes, you just cut a slot out of the bone, yes."

The transcript shows that this physician had not studied the hospital records, but comparison of those records with his testimony indicates the witness accurately described the operation performed by plaintiff's orthopedic surgeon on December 11, 1970.

In April 1971, plaintiff was examined by a plastic surgeon because the scars around the facial fracture had widened and the zygomatic bone, which makes up the lower portion of the eye socket, had sunk so there was a "defect of the left orbital rim." On April 20, 1971, plaintiff underwent a two-hour operation during which scars on the left forehead, eyebrow, upper and lower eyelids were excised; the wire which had been used to reduce the facial fracture was removed, and the rim of the bone below plaintiff's left eye was built up by using some sort of implant which was anchored to the underlying bone. On April 23, plaintiff was again discharged from the hospital. In June 1971, plaintiff returned to work.

The plaintiff's orthopedic surgeon examined his patient on March 31, 1978, in preparation for this trial. Upon examination, this physician found that plaintiff had a 15 percent loss of extension of his forearm, and 50 percent loss of forearm rotation— the pronation and supination which has been described. An x-ray was taken which showed that the three screws put in the ulna to hold the bone graft were still in place. The old injury to the bone was apparent but this physician thought the fracture was "probably healed." The elbow joint was beginning to show "wear and tear changes" which had been accelerated by plaintiff's original injury. This physician estimated the plaintiff had a 35 percent loss of use of his forearm.

The medical witness called by the defendant examined plaintiff on October 24, 1977, and again on November 6, 1978. This physician noted loss of plaintiff's ability to flex and extend his left forearm; the plaintiff's

loss of motion had increased slightly between October 1977 and November 1978. This physician's testimony was similar to that given by the plaintiff's physician, except he testified that in his opinion the fracture of the ulna would never heal. This physician noted, moreover, that because of plaintiff's loss of the rotating motion of his left forearm, plaintiff would be obliged to learn to do many things with his right hand which he had formerly done with his left. In November 1978, plaintiff had complained of pain in his left elbow after working.

To reiterate, the defendant's assignment of error, as briefed, is that "the jury's verdict of $140,000 in favor of the plaintiff was excessive, the [trial] court ignored defendant's motion requesting a remittitur, and a new trial should be granted." We find this argument unconvincing. We understand that, in this jurisdiction, excessive verdicts fall in two categories: (1) those verdicts reflecting simple excessiveness, and (2) those reflecting excessiveness by misconduct, where the result savors of bias and prejudice. *Walker v. Meder*, 609 S.W.2d 390, 391 (Mo.banc 1981); *Moore v. Glasgow*, 366 S.W.2d 475, 478 (Mo.App. 1963). As those cases and many others hold, simple excessiveness may be cured by enforced remittitur but excessiveness as a result of bias and prejudice requires a new trial. We also understand that a trial court has a discretion to order a remittitur which appellate courts do not have. *Nussbaum v. Kansas City Stock Yards Co. of Maine*, 359 S.W.2d 335, 341[6] (Mo.1962). We further agree it is possible, even likely, that the trial court misconstrued the defendant's motion for new trial when it ruled the motion was insufficient to invoke that court's discretionary power to order a remittitur.

It does not follow that defendant is entitled to a new trial. In this court, defendant has abandoned its contention that the verdict is so grossly excessive as to reflect bias and prejudice, and the trial court's refusal, for whatever reason, to order a remittitur is a ground for *reversal* only when the trial court has abused its discretion. *Morris v. Israel Brothers, Inc.*, 510 S.W.2d 437, 447[13] (Mo.1974); *Williamson v. Wabash R. Co.*, 355 Mo. 248, 256, 196 S.W.2d 129, 134[9] (1946); *Woodford v. Illinois Central Gulf Railroad Co.*, 518 S.W.2d 712, 718 (Mo.App.1974). There is a rule of law—usually invoked in criminal cases—that a trial court's refusal to exercise a discretionary power properly invoked may require *remand* for the exercise of that discretion, *State v. Damon*, 350 Mo. 949, 955, 169 S.W.2d 382, 383[2] (1943), but that rule has not been invoked here and we decline to consider its application sua sponte. We find neither an abuse of the trial court's discretion, nor excessiveness in the size of the verdict.

Reduced to essentials, defendant's point is simply that the jury awarded too much—the verdict is excessive as a matter of law. The ultimate test is what fairly and reasonably compensates the plaintiff for the injuries sustained. *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291, 309[18] (Mo. banc 1978). Applying that test here, we are unable to say the verdict is excessive. The plaintiff sustained two severe permanent injuries. Between July 22, 1970, and June 1971, plaintiff underwent four surgical procedures which, with deference to skillful surgeons, have a good deal in common with everyday carpentry. Plaintiff testified that before and after the first two operations "[his] arm hurt and bothered him all the time. [His] face felt like it was about ready to break, and [he] couldn't hardly see out of his eye." Plaintiff had pain at the time of the second two operations, and nearly 7 years afterward, still complained of pain upon movement of his left arm.

The defendant's argument that no impairment of earning capacity can be inferred because the plaintiff has sustained no actual loss of earnings is unsound. *Kleinlein v. Foskin*, 321 Mo. 887, 906–907, 13 S.W.2d 648, 657–658[14] (1929); *Baker v. Norris*, 248 S.W.2d 870, 875–876[9–12] (Mo. App.1952). The plaintiff was a young, able-bodied man at the time he was injured. He is, or was, left-oriented. His manner of speech and discourse indicates he is not very

well educated. He has always been employed as a manual laborer. The evidence clearly shows he has lost joint motion essential to the performance of any manual labor. A jury could reasonably infer a loss of capacity to work and earn, quite without the aid of expertise. We might prolong our discussion of this point, but it would serve no useful purpose. The contention is without merit.

 A final contention must be noticed, although we cannot pass on it. Defendant asserts that the trial judge ate lunch with counsel for the plaintiff at a snack bar in the Greene County Courthouse on the third day of the trial. Speculating that members of the jury may have seen the judge in the company of counsel for the plaintiff, defendant asserts that the trial judge's conduct was improper and a denial of due process to the defendant.

It is the duty of an appellant to provide an appellate court with a record containing everything necessary to the determination of questions presented to it. *Ingram v. Civil Service Commission*, 584 S.W.2d 633, 635[4] (Mo.App.1979). The point now being considered was raised in the motion for new trial, but was not supported by affidavit or otherwise as provided by Rule 78.05. Factual assertions in the brief cannot supplement the transcript. *In re Jackson's Will*, 294 S.W.2d 953[1] (Mo.App.1956). There is nothing before us for review on this point.

We find no error in any respect briefed or argued in this court. Accordingly, the judgment is in all respects affirmed.

BILLINGS, P. J., and MAUS, J., concur.

## ON MOTION FOR REHEARING OR TRANSFER TO THE SUPREME COURT

PER CURIAM:

 The appellant timely filed a motion for rehearing in this cause, earnestly arguing that this court had overlooked material matters of fact and had misinterpreted the law. The motion for rehearing was granted, and of course this left the appeal as if it had never been heard and the opinion filed became a nullity as if it had never been written. *In re McMenamy's Guardianship*, 307 Mo. 98, 116–117, 270 S.W. 662, 667[6] (banc 1925); *In re Thomasson's Estate*, 192 S.W.2d 867, 870[4–6] (Mo.1946). The parties were free to brief or argue any point preserved for review, even though that point had not been mentioned upon the first submission. *Martin v. Southwestern Bell Telephone Co.*, 344 Mo. 83, 85–86, 125 S.W.2d 19, 20[4] (1939). However, the motion was not accompanied by any request to file new briefs or to raise or argue points not briefed when the appeal was originally submitted. We therefore ordered the cause resubmitted to the panel which originally heard the case upon the briefs originally filed and the arguments originally heard and recorded here. Cf. *Thummel v. King*, 570 S.W.2d 679, 690[19] (Mo.banc 1978).

 The cause has been given entirely fresh consideration. Upon rehearing, an appellate court may adopt its former opinion, modify or expand its former opinion, or adopt a new and different opinion, *Frohman v. Lowenstein*, 303 Mo. 339, 348, 260 S.W. 460, 461[1] (banc 1924); *State v. Barnes*, 517 S.W.2d 155, 169 (Mo.App.1974), although it may not reverse its former holding without actual resubmission and rehearing of the appeal. *Granite Bituminous Paving Co. v. Park View R. & I. Co.*, 270 Mo. 698, 700–703, 196 S.W. 1142, 1144 (banc 1917). Upon fresh consideration of the entire record, we reach the same result. The opinion heretofore filed on August 13, 1981, is adopted as the opinion of this court.

 Successive applications for rehearing are neither required nor can they be entertained. Rule 84.17, V.A.M.R. No further application for rehearing by the appellant is necessary. The motion to transfer to the Supreme Court is denied.

BILLINGS, P. J., and HOGAN and MAUS, JJ., concur.